[Civ. No. 7742. First Appellate District, Division Two.—March 10, 1931.]

RICHFIELD OIL COMPANY OF CALIFORNIA (a Corporation), Respondent, v. HERCULES GASOLINE COMPANY (a Corporation) et al., Appellants; E. H. MARSHREY et al., Interveners and Respondents.

Bernard Potter for Appellants.

Rohe & Freston, R. D. McLaughlin, Campbell & Campbell and George W. Nilsson for Respondents.

NOURSE, P. J.—Plaintiff sued for an injunction and for an accounting. The interveners entered the litigation for the aid of plaintiff. Judgment went for plaintiff and interveners, awarding them a permanent injunction and damages. The defendants appeal upon a bill of exceptions.

Plaintiff and one Horwitz executed a written contract whereby the former agreed to purchase and the latter agreed to sell and deliver the crude oil which Horwitz might produce from a certain well being sunk in the Alamitos Heights district. Deliveries were to be made from the tanks of the owner located on the property to which the oil company was permitted to connect its pipe-lines. A maximum daily and monthly delivery was fixed by the contract and the price agreed to be paid for the oil was the market price as determined by ''the prices per barrel publicly offered by the Standard Oil Company of California at dates of delivery . . . for oil of like gravity and quality''. A special price of ten cents a barrel below market was fixed for the first fifty thousand barrels delivered.

Horwitz deeded the property in fee simple to the defendant Clark after he had failed to develop oil and had abandoned work on the well. Clark then executed a contract with his co-defendant Hercules Gasoline Company for the sale of the oil at a more favorable price than that covered by the Horwitz contract.

The theory upon which the interveners came into the litigation was this: Horwitz had assigned to these interveners certain percentages "of the gross production of all the oil, gas and other hydrocarbon substances saved and *sold* from any well drilled" upon the premises. The proceeds of the sale of the oil produced were to be deposited in a Long Beach bank which was authorized to pay over to the interveners their proportional shares. Alleging that the defendant Clark was insolvent and that their damages for breach of their contracts could not be ascertained they prayed for the same injunctive relief sought by the plaintiff. In order to bring the cause within the equity jurisdiction of the court the plaintiff and the interveners pleaded that the defendant Clark was insolvent and that the failure of Clark to abide by the terms of his contract with plaintiff would result in irreparable damage to them. The plaintiff also alleged that, in reliance upon the contract, it had installed expensive pipe-lines for conveying the oil from the premises. The trial court found that it was not true that defendant Clark was insolvent; it failed to find on plaintiff's allegation that it made expenditures in reliance upon the contract, but all the evidence showed that the allegation was not true. It drew the conclusion of law that plaintiff and interveners would suffer irreparable damage because there was no way to ascertain the amount of compensation to afford them adequate relief.

On the appeal from the judgment in favor of the plaintiff the appellants insist that the oil company failed to present a case for equitable relief upon the contract because, 1, the contract did not create an interest in real property, and 2, it being merely an agreement to sell personal property which could not be specifically enforced the plaintiff had an adequate remedy at law for damages for the breach. Many assignments of error are also relied on but, as we are in accord with appellants in the two foregoing propositions, and, as the judgment must be reversed for that reason, we will not discuss the other assignments in so far as they relate to the plaintiff.

The theory upon which the plaintiff relies to maintain its claim that the contract created an interest in the land is that it established a "profit *à prendre*". The courts of this

state have never been in doubt about the true meaning and intent of the expression "profit *à prendre*". Ruling Case Law defines it as "a right to take a part of the soil or produce of the land," such as the right to take timber or coal, or to fish in the water of another. (9 R. C. L., p. 744.) It is distinguished from an easement, one of the features of which is the absence of all right to participate in the profits of the soil charged with it. ■ A "profit *à prendre*" is considered an interest or an estate in the land itself and this is the principal feature which distinguishes it from a pure easement, which is a right or interest without profit. It is a right to take something out of the soil of another, as a right of common, and also some minor rights as a right to fish, hunt and hawk, or to mine metals, dig for oil; take oil from the land.

The feature of the right which is of interest to the point under consideration is that it creates an interest in the real property in the nature of a covenant running with the land as distinguished from a mere personal obligation of the owner of the realty. The underlying principle of the right is that it carries the right of entry and the right to remove and take from the land the designated product or "profit". A typical case is the right to cut and remove standing timber and the right to mine and remove coal and other minerals. Thus, the common oil and gas lease under which the lessee is entitled to enter upon the land of the lessor and develop and remove oil or gas is a "profit *à prendre*". The authorities are agreed on this principle, basing their reasoning on the ground that the oil and gas is a part of the realty and is real property until severed. ■ Out of this rule has grown the further doctrine that there can be no grant or conveyance of oil or gas in place separate and apart from the right to go upon the premises and extract them. (1 Thornton's Law of Oil and Gas, p. 148; *Rich* v. *Doneghey*, 71 Okl. 204 [3 A. L. R. 352, 177 Pac. 86, 90]; *Campbell* v. *Smith*, 180 Ind. 159 [101 N. E. 89].) There are exceptions to this rule found in the decisions coming from the states of Texas and Kentucky, where the courts have held that oil and gas in place are minerals subject to separate ownership, severance and sale in like manner as coal and other solid minerals (*Stephen County* v. *Mid-Kansas Oil & Gas Co.*, 113 Tex.

160 [29 A. L. R. 566, 254 S. W. 290]; *United Fuel Gas Co.* v. *Swiss Oil Corp.,* 41 Fed. (2d) 4).

This difference of opinion as to the rights of the land owner in the oil and gas in place explains some of the authorities cited by respondent on the application of the doctrine of "profit *à prendre*"; but we have found the authorities agreed that these substances are a part of the realty until severed and brought under control, and that, when this has been done, they are personal property subject to sale as such. (*Southwest Pipe Line Co.* v. *Empire Nat. Gas Co.,* 33 Fed. (2d) 248, 252 [64 A. L. R. 1229]; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 208 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576, see, also, Rose's U. S. Notes].)

 Under the contract upon which plaintiff relies the owner of the land agreed to *sell* to plaintiff all the crude petroleum *produced* by the owner from the wells located on the premises, deliveries to be made from the *tankage of the owner.* This contract confers no right upon the plaintiff to enter the premises and develop oil or to sever the oil from the realty. It is a plain executory contract for the sale of personal property of and when that property should come into the possession of the vendor. The exclusive right to develop and produce the oil is left with the vendor. He retains exclusive possession and title of and to the realty, and hence of the oil in the ground until the oil is severed and delivered to the tanks maintained by him on his own premises. Before the oil is thus delivered to the tanks the vendee has no legal title and it matters not that it is permitted under the contract to construct a pipe-line to the tanks to facilitate delivery. We can see no distinction between this situation and one where the owner of realty contracts to sell fruits raised on his premises, deliveries to be made at a warehouse maintained by him with a right to the vendee of ingress to and egress from the warehouse for purpose of delivery. Certainly in such a case no interest in the land is conveyed.

Concluding, as we must, that the contract in suit did not convey any interest in the real property, but that it was merely a contract to sell personal property, it necessarily follows that plaintiff is not entitled to equitable relief because, 1, it has an adequate remedy at law, and 2, the contract is not subject to specific enforcement.

■ Plaintiff's remedy for the alleged breach of the contract is statutory. Section 3308 of the Civil Code provides that the detriment caused by the seller's breach of an agreement to deliver personal property shall be deemed to be the excess, if any, of the value of the property to the buyer over the contract price. Thus the plaintiff had an adequate remedy at law for the damages resulting from the breach, if any, with the measure of damages clearly fixed by law. Section 3387 of the Civil Code provides that it is to be presumed that the breach of an agreement to transfer personal property can be adequately relieved by pecuniary compensation, and there is no evidence in this record tending to rebut that presumption. The trial court found that plaintiff's damages could not be "readily" ascertained, but there was no evidence supporting the finding, and if the finding were true it would be so only because there would be no excess of the value of the oil to the plaintiff over the contract (or market) price and, hence, no damage to plaintiff. Thus the suit of plaintiff resolves itself into an action to compel the specific performance of a contract for the sale of personal property where the damages, if any, to the plaintiff could be ascertained in the event of a breach. That such an action does not lie under such circumstances is the rule of *Poultry Producers, etc., v. Barlow,* 189 Cal. 278, 288 [208 Pac. 93]. Pertinent to the questions before us the court in that case (p. 289 of 189 Cal.) said: "Growing out of the last of the three enumerated reasons for the rule that equity will not specifically enforce a contract for services that are of a strictly personal nature, is the cognate rule that courts of equity will not decree the specific performance of contracts which by their terms stipulate for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous and require protracted supervision and direction." To the same effect are: *Chandler* v. *Hollingsworth,* 96 Cal. App. 472, 478 [274 Pac. 581], *Sheehan* v. *Vedder,* 108 Cal. App. 419 [292 Pac. 175], *Moore* v. *Heron,* 108 Cal. App. 705 [292 Pac. 136], and Pomeroy on Specific Performance, 3d ed., sec. 312.

In the same case it was held that an injunction would not lie to prevent a breach of such a contract and this rule has been generally followed. (See *Duvall* v. *White,* 46 Cal. App. 305, 308 [189 Pac. 324]; *Emirzian* v. *Asato,* 23 Cal.

App. 251, 255 [137 Pac. 1072].) The reason for the rule is well expressed by Mr. Justice Chipman in the latter case. (p. 256): "If the personal property has a market value, is bought and sold in the open market, and has no special or unique value, the remedy at law is sufficient since with the unpaid purchase money and the moneys recovered by action the vendee can buy in the open market property of the same character as that contracted for, if the vendor is in fault."

The evidence is undisputed that there was a great over-supply of crude oil in the Alamitos fields and that the plaintiff was obtaining all that its refineries could handle. It was also undisputed that the market price of crude oil was fixed periodically by the Standard Oil Company and that these prices were treated as the daily market price by all those dealing in oil. Though no evidence was taken on the subject, it is a matter of common knowledge that the daily flow of oil can be readily measured. The case is not unlike the illustration given in the Emirzian case, reading. from page 257 of 23 Cal. App.: "We cannot see that this case is any different from that where a farmer agrees to sell, but afterward refuses to deliver, a certain number of tons of alfalfa hay or other product of his farm of which there is an abundance to be purchased in the open market. In such a case we do not think it would for a moment be contended that the vendee could go into an equity court and restrain this farmer from selling his hay to some other person; compel him to irrigate or otherwise care for it and bale and deliver it to the vendee at some future time."

Stripping the appeal from all the by-play we hold that the plaintiff did not present an action for equitable relief—its remedy is an action for damages for alleged breach of a simple contract to sell personal property, but, as to its right to recover damages on that contract, we express no opinion. The interveners had no place in the litigation at any stage of the proceeding. Their rights rest entirely upon their assignments of the proceeds of the sale of the oil—they had no right at any time to designate the vendee. If their assignments are valid and enforceable against these defendants they could then be heard to insist that the proceeds of the sale of the oil be deposited with the Long Beach bank in accordance with the terms of their assignments.

But these are questions which are not involved in this appeal.

The judgment is reversed.

Sturtevant, J., and Spence., J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 9, 1931, and a petition by respondents to have .the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 4, 1931.