### In re LATHRAP.

### LAMBERTON et al. v. LAUGHARN.
### No. 6742.

Circuit Court of Appeals, Ninth Circuit,
Aug. 10, 1932.

Cree & Brooks, of Long Beach, Cal., for appellants.

Raphael Dechter, of Los Angeles, Cal., for appellee.

Joseph J. Rifkind, of Los Angeles, Cal., and Hy Schwartz, of Los Angeles, Cal., amici curiæ.

Before SAWTELLE, Circuit Judge, and NETERER and ST. SURE, District Judges.

SAWTELLE, Circuit Judge.

This appeal is prosecuted from an order of the District Court, confirming an order of the referee, in which latter order the appellants were held to be coadventurers and coinvestors with the bankrupt, and their claims adjudged subordinate to those of creditors.

The bankrupt, Frank H. Lathrap, is the lessee of a certain parcel of real property, under an oil and gas lease in the ordinary form, giving him the right to prospect upon the property and produce oil therefrom. Pursuant to a permit issued by the Department of Investment, Division of Corporations, of the State of California, the bankrupt, for an executed consideration, "sold" to the appellants and others "royalty interests" in Lathrap Well No. 1, at Signal Hill, Cal.

The bankrupt issued to each of the appellants who acquired such "royalty interests" an "assignment" containing, among others, the following provisions:

"Now, therefore, in consideration of the sum óf Ten ($10.00) Dollars, * * * the undersigned, F. H. Lathrap, does hereby sell, assign, transfer and set over unto ————, her heirs, assigns and legal representatives, a royalty interest equivalent to one (1) per cent of the gross proceeds received from the sale of One Hundred per cent (100%) of the oil and/or gas produced and sold from the well now being sunk on said premises under and by virtue of said Lease or any assignment thereof; said proceeds to be payable as and when Lessors['] royalty is payable and shall be disbursed through a reputable bank or title company doing business in the City of Los Angeles, California, and any and all purchasers of oil and/or gas produced from said well are hereby authorized and directed to pay said royalty direct to said Bank, less the hereinafter mentioned deduction.

"The undersigned agrees that he is the owner and holder of said interest hereby

conveyed, that said Lease is in full force and effect and that he has not heretofore sold, assigned, or conveyed this royalty interest or any portion thereof; that this interest is free and clear of any drilling or deepening expense, but shall be subject to the deduction and payment (out of said proceeds) of the sum of Ten ($10.00) Dollars per month, for each One per cent (1%) hereby assigned, which sum shall be expended solely in the operation and maintenance of said well and for no other purpose; and its pro-rata share of Mineral Rights Tax.

"It is further understood that no relationship other than that of vendor and vendee is intended to be created by this Assignment, and that no co-partnership or association of any kind or description whatsoever is intended to be hereby created, nor shall same constitute Assignee Co-Lessee of said premises."

The form of the above assignment was approved by the Commissioner of Corporations of California, and "royalty interests" amounting to $42\frac{1}{2}$ per cent. of the production of the well in question were issued to the appellants as securities.

Shortly after the adjudication in bankruptcy, the trustee was by the referee granted authority to disburse to the appellants and the other holders the proceeds received by the trustee, corresponding to 52 per cent. of the production. After the making of that ex parte order, however, the trustee petitioned the referee for a preliminary hearing on "the matter of the validity and priority of such per cents over the claims of creditors." After such hearing had been held, the above-mentioned orders were entered.

The determination of this case hinges upon the relationship of these "per cent holders" to the bankrupt. Are they outright purchasers of the bankrupt's oil? Or are they cestuis que trustent, preferred creditors, junior creditors, sleeping partners, joint adventurers, grubstakers—or still something else?

It is conceded by counsel for the appellants that the case is one of first impression, so far as appellate courts are concerned. There are, however, a number of well-reasoned decisions by California and federal courts that can assist us in applying fundamental principles of law to the problem in hand, without our having to stray too far afield in search of analogies.

■ Our first task, in the language of the Supreme Court of California, "is to place ourselves as near as possible in the seats which were occupied by the parties at the time the instrument was executed; then, taking it by its four corners, read it." Walsh, etc., v. Hill et. al., 38 Cal. 481, 487.

We find an instrument that purports to "sell, assign, transfer and set over" to the holder "a royalty interest equivalent to one per cent of the gross proceeds received from the sale of one hundred per cent of the oil and/or gas produced and sold" from a certain well "now being sunk."

Counsel for the appellants strenuously argue that these assignments in effect "constitute a present sale to the assignee thereof of a portion of the oil and gas to be produced from the well." But an examination of the instruments themselves discloses that they do not purport to convey any title to *oil*. The royalty interest is measured in terms of "gross proceeds," and not in terms of the commodity from which those proceeds are to be derived. Had a sale of oil been intended, it would have been a simple matter to have specified that the royalty interest conveyed was to be "equivalent to one per cent of the oil or gas produced." From the assignments as they now stand, it can be seen that a share in proceeds is transferred, and that there is a designation merely of the *source* from which the proceeds are to be derived. There is no attempt to transfer the corpus itself.

■ Before the oil was sold, title thereto resided in the bankrupt: after it was sold, it was vested in the purchasers of the commodity. These per cent. holders acquired title to the oil itself for not even a fleeting instant. They were not interested in oil; they were interested in proceeds. There are no provisions for *delivery*, but elaborate provisions for *payment*.

■■ According to the weight of authority in California and according to the doctrine repeatedly enunciated by the Supreme Court of the United States, title to oil or gas in place cannot be transferred in præsenti. Nor can there be any transfer of such title, either present or prospective, without the accompanying right to go upon the land and extract the oil or gas. In the instant case, the appellants were granted no such right.

Furthermore, the statutes of California, as they existed at the time these per cent. assignments were issued, support this view. Following are the pertinent sections in the Civil Code of California (Deering, 1923):

"1140. *Transfer of title under sale.* The title to personal property, sold or exchanged,

passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not.

"1141. *Transfer of title under executory agreement for sale.* Title is transferred by an executory agreement for the sale or exchange of personal property only when the buyer has accepted the thing, or when the seller has completed it, prepared it for delivery, and offered it to the buyer, with intent to transfer the title thereto, in the manner prescribed by the chapter upon offer of performance."

"1721. *Sale, what.* Sale is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property.

"1722. *Subject of sale.* The subject of sale must be property, the title to which can be immediately transferred from the seller to the buyer."

"1730. *What may be the subject of the contract.* Any property which, if in existence, might be the subject of sale, may be the subject of an agreement for sale, whether in existence or not."

In the early case of McLaughlin v. Piatti et al., 27 Cal. 451, 462, 463, the Supreme Court of California laid down the basic doctrine governing sales, in the following language: "It is a fundamental principle pervading everywhere the doctrine of the sales of chattels, that if goods be sold (while mingled with others) by number, weight, or measure, the sale is incomplete, and the title continues with the seller until the bargained property is separated and identified. The reason is that the sale cannot apply to any article until it is clearly designated and its identity ascertained."

Applications of this fundamental principle to the transfer of interest in oil in place was made by the same tribunal in the case of People v. Associated Oil Co., 211 Cal. 93, 101, 102, 103, 104, 294 P. 717, 721, decided December 3, 1930. Since that decision is the latest expression on the subject by the Supreme Court of California, and since it quotes freely from opinions of the Supreme Court of the United States, we are transcribing somewhat full excerpts from the California case: "The rule universally adopted, except in Montana, is expressed in Brown v. Spilman, 155 U. S. 665, 39 L. Ed. 304, 15 S. Ct. 245, 247, as follows: 'Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have

a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are part of it, so long as they are on it or in it or subject to his control; but when they escape and go into other land or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.' (Citing cases.) In this state the character of oil beneath the surface, as distinguished from that of the precious metals, fixed in the veins which hold them, was well described in Acme Oil & Min. Co. v. Williams, 140 Cal. 681, at page 684, 74 P. 296, 297, wherein it was said: 'Oil, on the contrary, is of a fluctuating, uncertain, fugitive nature, lies at unknown depths, and the quantity, extent, and trend of its flow are uncertain. It requires but a small surface area, in what is known as an oil district, upon which to commence operations for its discovery. But when a well is developed the oil may be tributary to it for a long distance through the strata which holds it. This flow is not inexhaustible, no certain control over it can be exercised, and its actual possession can only be obtained, as against others in the same field, engaged in the same enterprise, by diligent and continuous pumping. It is anybody's property who can acquire the surface right to bore for it, and when the flow is penetrated, he who operates his well most diligently obtains the greatest benefit, and this advantage is increased in proportion as his neighbor similarly situated neglects his opportunity.' The same rule would apply to natural gas. It is common knowledge that the surface right to prospect for and recover oil and gas, apart from the land in which they are situated, is the subject of barter, lease, or sale. When so acquired the right is subject to assessment apart from the land. Graciosa Oil Co. v. Santa Barbara, 155 Cal. 140, 20 L. R. A. (N. S.) 211, 99 P. 483. The generally accepted view, therefore, is that the property right of the owner or lessee of land in and to the gas and oil beneath the surface is not an absolute one. Such substances, because of their peculiarity in the natural state, partake more of the nature of common property, title to which becomes absolute when they are captured and reduced to possession. Because of their peculiar nature the public has a definite interest in their preservation from waste and destruction. * * * The leading case on the power of the state to prevent the waste of

natural gas is Ohio Oil Company v. Indiana, 177 U. S. 190, 44 L. Ed. 729, 20 S. Ct. 576.''

Obviously, if the owner or lessee has no present title to oil in place, he cannot transfer a present title to a "per cent holder" or to any one else.

The necessary concomitant to a transfer of any title to oil in place was properly stated by the District Court of Appeal for the First District of California, in Richfield Oil Co. of California v. Hercules Gasoline Co. et al., 112 Cal. App. 431, 297 P. 73, 75, decided March 10, 1931, hearing denied by the Supreme Court of California on May 4, 1931: "The authorities are agreed on this principle, basing their reasoning on the ground that the oil and gas is a part of the realty and is real property until severed. Out of this rule has grown the further doctrine that there can be no grant or conveyance of oil or gas in place separate and apart from the right to go upon the premises and extract them. [Authorities cited.]"

See, also, the following California cases: Bandini Petroleum Company et al. v. Superior Court of Los Angeles County et al., 110 Cal. App. 123, 127, 133, 293 P. 899, 901, hearing denied by the Supreme Court of California on January 26, 1931; Gracchi et al. v. Friedlander, etc., 93 Cal. App. 770, 773, 270 P. 235, quoting McLaughlin v. Piatti, supra; People v. McCalla et al., 63 Cal. App. 783, 791–792, 220 P. 436, hearing denied by the Supreme Court of California on November 26, 1923.

In the Bandini Case, supra, the court used the following language: "We think, however, that the better reasoning, on account of the self-propelling or migratory character of natural gas, as well as oil, dictates the conclusion that while in general we may speak of the owner of the surface as being the owner of the gas and oil in place, what we really mean is that he and he alone has the right through his own property to endeavor to reduce the substances to possession; that when they are reduced to possession and then only does he have an absolute and unqualified title thereto."

It is noteworthy that both the Bandini Case, supra, and the Associated Oil Case, supra, which are related causes, have received the stamp of approval of the Supreme Court of the United States. The Bandini Case was affirmed and part of the above language quoted, and the language of the Associated Oil Case on another point was quoted as controlling by the Supreme Court in 284 U. S. 8, 16–18, 19, 52 S. Ct. 103, 76 L. Ed. 136.

We are aware that language in conflict with the foregoing statements of the law is to be found in the California reports; but we believe that such expressions are not in accord with the sound and authoritative view, both in California and elsewhere.

In Ohio Oil Company v. Indiana, supra, the Supreme Court of the United States thus stated the important qualification to the landowner's title to oil in place: "Although in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession."

As we have already observed, if the owner has no present title to the oil in place, it is axiomatic that he cannot transfer a present title to another. The "present sale" contended for by the appellants, therefore, cannot come into being by virtue of these per cent assignments. See, also, Leydig v. Commissioner of Internal Revenue (C. C. A. 10) 43 F.(2d) 494, 496.

Cases involving sales of future crops have been cited by the appellants. We do not think such decisions applicable to the instant litigation. When future crops come into actual existence, their situs, like that of the hard minerals, is fixed; it is not "fugitive" or "fugacious," like that of oil or gas in place. And it must be remembered that it is this wandering nature of oil in place which has caused a distinct jurisprudence to be built up as to present sales of that commodity.

It is true that, both in the case of future crops and oil in place, there is the same element of chance, namely, that the crops will not be planted or, if planted, will not mature, and that the oil will not be struck. But, once the crops are grown, there is no danger that they will *move away*.

If it is contended that these per cent. assignments can be sustained at least as executory, if not executed, sales—contracts to sell, in other words—the answer is simple. If they indeed are executory contracts, the trustee in bankruptcy has the election to repudiate them, and leave the other parties to seek redress, if any, in suits for damages.

In Atchison, T. & S. F. Ry. Co. et al. v. Hurley et al. (C. C. A. 8) 153 F. 503, 510,

affirmed 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729, the rule was thus stated: "It is well settled that trustees in bankruptcy are not found [bound?] to accept property or take over contracts which are onerous and unprofitable, and which would burden, rather than benefit, the estate. In the execution of their trust they are confronted at the outset with the duty of electing whether to assume an existing executory contract, continue its performance, and ultimately dispose of it for the benefit of the estate or to renounce it and leave the injured party to such legal remedies for the breach, as the case affords. [Many cases cited.]"

See, also, Watson v. Merrill (C. C. A. 8) 136 F. 359, 363, 69 L. R. A. 719; In re Grainger (C. C. A. 9) 160 F. 69, 75; 2 Remington on Bankruptcy (3d Ed.) § 1154, page 494.

Furthermore, it should be observed that the parties have not complied with the requirements of section 1141, supra, relating to the transfer of title under an executory agreement of sale. The "buyer" has not "accepted the thing," nor has "the seller * * * completed it, prepared it for delivery, and offered it to the buyer, with intent to transfer the title thereto, in the manner prescribed by the chapter upon offer of performance."

We do not believe that these assignments, however, purport to convey title to oil. By their terms they transfer a royalty interest equivalent to one per cent. of the gross proceeds received from the sale of oil and/or gas "produced and sold from the well now being sunk." It is true that the assignment sets forth "that no relationship other than that of vendor or vendee is intended to be created"; but even if we accept this label fixed by the parties, at most it means that there was a sale of a *royalty interest*. And that royalty interest, by the very terms of the assignment, is measured in money, and not in oil.

What effect, then, with regard to the status of the per cent. holders, has such an "assignment"? Numerous federal decisions will aid us in arriving at an answer. While the cases to which we will refer involved holders of interests in *corporations,* they present facts otherwise analogous to those at bar.

Indeed, the analogy between these per cent. holders and holders of similar securities of an actual corporation is borne out by the provisions of the Corporate Securities Act, as it read after the amendments of 1929 (St. 1929, p. 1251, § 1):

"Section 2 (a) * * *

"3. The word 'company' includes all domestic and foreign private corporations, associations, joint stock companies, and partnerships of every kind, trustees as hereinafter defined, and also individuals as hereinafter defined. * * *

"6. The word 'individual' in so far as it is included in the definition of a 'company,' includes only persons selling, offering for sale, negotiating for the sale of or taking subscriptions for any security of their own issue.

"7. The word 'security' shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining lease, collateral trust certificate, preorganization certificate, preorganization subscription, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings or any other instrument commonly known as a security."

Further evidence of the analogy is to be found in the fact that a permit for the sales of the instant securities was taken out by Lathrap from the State Corporation Department. Indeed, in their brief, counsel for the appellants not only admit but contend that "the Corporate Securities Act, by its specific terms, through the administrative machinery thereby created, has given recognition to the instruments in question."

There seems little doubt, then, that cases dealing with actual corporate per cents. should be helpful in determining the legal import and meaning of the instant assignments.

Since per cent. certificates are comparatively a recent device, we must expect to find that cases more or less squarely in point have been decided only in the last few years. The first federal decision involving facts on all fours with those of the case at bar was United States & Mexican Oil Co. v. Keystone Auto Gas & Oil Service Co. (D. C. Pa.) 19 F. (2d) 624, 625. In some respects that decision was based on facts that were more favorable to the certificate-holders than those in the instant case. There the certificates themselves contained the following provision: "To provide funds hereinbefore mentioned from the receipts of said station there shall be set aside in a bank one cent on each gallon of gasoline sold, and 5 per cent. on all merchandise sold by said station, and *the fund thus*

*created* shall be distributed every month among the registered holders of these certificates in said stations as their interest may appear." (Italics our own.) It will thus be seen that in the above case at least an attempt was made definitely to create what might be termed a trust fund for the benefit of the per cent. holders. Yet in the face of such specific attempt, Judge Schoonmaker said, at page 626 of the reported opinion in 19 F.(2d):

"On general principles of public policy, we believe that this contract is void as against the claims of general creditors. To permit corporations, by means of certificates of this kind, to appropriate corporate assets to certain classes of creditors or shareholders, whatever they may be, would be an absolute fraud upon the general creditors of the corporations concerned, and would permit the creation of a special type of preferred creditors not contemplated by law. If enforceable at all, this contract should only be enforced as against the stockholders of the company, and not against the rights of creditors who have dealt with the corporation in the ordinary way. To give validity to such a contract would be to establish a legal vehicle for corporation fraud and illegal preference of creditors. These certificate holders cannot claim any part of the corporate funds to the detriment of general creditors.

"There is no special equity vested in these certificate holders that should be protected. There is no special equity founded on the relation of these certificate holders to the funds on deposit in the several banks in question that should be protected. The fund in bank bears no special relationship to their money contributions to the company. The money in bank came from the sale of general assets of the company—i. e., gasoline and other merchandise—in the regular and ordinary course of business. To impress this fund with a special trust in favor of these certificate holders would be wrong and a fraud on general creditors.

"These certificates evidence an attempt on the part of the defendant to create a novel type of stock ownership, which would be superior in its claim to corporate assets over that of the corporate creditors. There is no equity in their claim or position, and there is no statutory authorization to create such a class of preferred stockholders or creditors, whatever you may call them. The funds in bank were not reduced to their possession; they have no claim on it."

The foregoing case was followed in Re Hawkeye Oil Co. (D. C. Del.) 19 F.(2d) 151, 152. There the language attempting to create a trust fund was almost identical with that found in the certificates involved in the United States & Mexican Oil Company Case. Yet there, too, the court said: "The money to be paid by the company was not to be paid absolutely and at all events, but from a fund arising from the operation of the company. Whether the holders of such contracts are more analogous to stockholders (Fletcher, Cyclopedia Corporations, § 3631) than to sleeping partners is, I think, not of such vital importance as the underlying fact, upon which I am in accord with Judge Schoonmaker and the referee, that they are not creditors, but are coadventurers with the stockholders, hazarding their investment upon the continued operation, and hence upon the success, of the company. The rights of such persons are subordinate to those of general creditors. See Fletcher, Cyclopedia Corporations, § 3634."

We may observe in passing that several United States District Courts of California, in addition to the learned judge below, in recent decisions have construed certificates of this kind in the same way.

Although per cent. holders are a recent product of corporate finance, and therefore, in a sense, sui generis, they bear a close analogy to preferred stockholders. As to the rights and risks of the latter, the Supreme Court has had this to say, in Warren & Others v. King & Others, 108 U. S. 389, 399, 2 S. Ct. 789, 798, 27 L. Ed. 769: "Whatever position the holders of preferred certificates occupied before they accepted preferred stock, whatever special right of lien they had, they became corporators, proprietors, shareholders, and abandoned the position of creditors, and took up towards existing and future creditors the same position which every stockholder in a corporation occupies towards existing and future creditors. His chance of gain, by the operations of the corporation, throws on him, as respects creditors, the entire risk of the loss of his share of the capital, which must go to satisfy the creditors in case of misfortune. He cannot be both creditor and debtor, by virtue of his ownership of stock."

So in the instant case. Whether or not the per cent. holders come under the technical classification of stockholders, they are,—like stockholders, partners or joint adventurers—"investors," participants in the common enterprise. Had the bankrupt prospered and continued the operation of the oil well, these

per cent. holders would have prospered with him, to an extent that their certificates did not even attempt to limit. Conversely, these same holders must be prepared to share in the bankrupt's misfortunes. There is no equity in their favor that places them in a position equal to that of general creditors, who sold merchandise or labor at only a normal profit. The creditors should not be the first to be sacrificed. It is the "investors" who should be ready to take the bitter with the sweet.

In Armstrong et al. v. Union Trust & Savings Bank, 248 F. 268, 271, this court said: "These certificate purchasers must be held to full knowledge and appreciation of the real character of their investments, and that they were to become participants in the enterprise, and not mere creditors of the corporation. To intimate otherwise would be to impugn their intelligence."

On page 270 of the same opinion it was stated:

"The stockholder must therefore stand aside in the winding up of the business of a corporation until its creditors are paid, before he can share in the assets. * * *

"Concurring in the view that the name by which an instrument is called does not attest its real character, we may inquire whether these certificates render the holders creditors or stockholders—call them preferred stockholders or what not."

See, also, Elko Lamoille Power Co. v. Commissioner of Internal Revenue (C. C. A. 9) 50 F.(2d) 595, 597; In re G. L. Miller & Co., Inc. (D. C.) 35 F.(2d) 966, 967, affirmed (C. C. A. 2) 35 F.(2d) 968; Hazel Atlas Glass Co. v. Van Dyk & Reeves, Inc. (C. C. A. 2) 8 F.(2d) 716, 718–720; Spencer et al. v. Smith et al. (C. C. A. 8) 201 F. 647, 649, 652, 654, 655–656; In re Sharood Shoe Corporation (D. C.) 192 F. 945, 956; Hamlin et al. v. Toledo, St. L. & K. C. R. Co. et al. (C. C. A. 6) 78 F. 664, 670–671, 36 L. R. A. 826, which was cited with approval in Continental Insurance Company et al. v. United States Reading Co., et al., 259 U. S. 156, 181, 42 S. Ct. 540, 66 L. Ed. 871; Fletcher's Cyclopedia of the Law of Private Corporations, vol. 6, § 3634, pp. 6030–6032; 2 Words and Phrases, "Creditors," Third Series, p. 687.

As was said by the court in Re Sharood Shoe Corporation, supra: "A case much stronger than this must be made before the petitioner will be allowed 'to lay aside the garb of a stockholder and on one pretense or another to assume the rule of a creditor.'"

In the instant case, indeed the per cent. holders are seeking to occupy positions even more favorable than those of ordinary, general creditors; they are asking to be regarded as vendees of specific oil, entitled to recover the oil itself or the proceeds derived from its sale. A fortiori, we cannot uphold their claims.

It is not necessary, however, for us to regard the appellants as technically in the nature of joint adventurers or stockholders, in order to determine that their status is inferior to that of general creditors, who have dealt with the bankrupt in good faith and only for a normal profit. Counsel for appellants have repeatedly called them "investors." As was said by the Circuit Court of Appeals for the Eighth Circuit in Re Hicks-Fuller Co., 9 F.(2d) 492, 493:

"Of course, if appellants are merely preferred stockholders their rights would be subject to all debts of the corporation, including general creditors. But it is not necessary for appellants to be stockholders to place them after general creditors in the payment of their claims. They can be creditors, as distinguished from stockholders, and yet have no right to payment, in case of insolvency of the corporation, until after general creditors have been paid in full. The finding of the referee, affirmed by the court, was that the claimants were 'creditors of the bankrupt corporation' junior, in right of payment, to general creditors. Appellants seem to assume that this amounted to a finding that claimants were stockholders. This is not necessarily true. It is entirely possible for a creditor, either through the contract giving rise to the indebtedness or through some other contract affecting his status or governing his rights, to bind himself to give precedence to ordinary creditors. That is the view of the court in the case of Wright v. Johnston, 183 Iowa, 807, 167 N. W. 680, upon which appellants most rely for a reversal here. The opinion in that case in addition to citations and quotations contains (at page 682 [of 167 N. W. (183 Iowa, 813)]) the clear statements following:

"'What the certificates are, as evidenced by their terms and the articles of incorporation authorizing their issuance, and not what they are denominated, must determine their character.'"

Finally, in their brief, counsel for the appellants say: "It is hardly conceivable that the Trustee can take the position that the petitioners herein are partners with the bankrupt in any project or venture what-

soever except the drilling of 'Lathrap Well No. 1', in which they own royalty interests or per cents."

Under the views that we have heretofore expressed in this opinion, it is not necessary to pass upon this contention of the appellants. Since we hold that there was no oil sold to the appellants, or no trust or special fund created for their benefit, which could render them superior or even equal to general creditors, there is no need further to discuss the proposition as to which well failed and which well succeeded.

We hold that the appellants are not creditors of the bankrupt, but are claimants to the residuum of the estate, after the general creditors have been paid. These per cent. holders are junior in right to the general creditors who furnished commodities to the bankrupt not at speculative, but at normal profit.

Accordingly, the order of the lower court is affirmed.