## BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N v. FISHER.

### No. 6687.

Circuit Court of Appeals, Ninth Circuit.

Aug. 22, 1932.

Herbert Freston, of Los Angeles, Cal. (Freston & Files, of Los Angeles, Cal., of counsel), for appellant.

Rex B. Goodcell, of Los Angeles, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

In this proceeding, the receiver of the Lake View Oil & Refining Company sought the advice of the lower court regarding three contracts between that corporation and the appellee. The court had before it no evidentiary matter, and therefore was largely dependent upon the terms and provisions of the contracts themselves for guidance.

The court below interpreted the contracts as giving the appellee "an interest in the oil product," and instructed the receiver "to act in accordance" with that interpretation. The court also entered an "order approving contracts with John H. Fisher, as modified," the modifications reducing Fisher's share of the net production of oil under two of the contracts from 100 per cent. until his investment is returned to 50 per cent. From that order, the present appeal was taken.

Except for an immaterial modification and additional paragraphs hereinafter discussed, the contracts are of the same general tenor. Exhibit A, being the contract entered into on November 9, 1928, reads in part as follows:

"Second party [Fisher] shall on demand furnish to first party [the oil company] $25,000 which said sum shall be expended by first party for the purpose of deepening and repairing certain wells on the property of first party, the manner in which said money is to be expended for the said purpose is solely at the discretion of the officers of the first party, but first party agrees to immediately advise second party of the number of the well or wells on which said money is to be expended, and within twenty-four hours first party is to give second party notice of the expending of any of said money on any additional wells.

"It is agreed that in the event oil is produced in paying quantities from any well or wells on which said money is expended by said first party, then all of the net production of said well or wells (and by net production is meant full amount of production saved, sold and disposed of, less the royalties paid thereon by first party) shall be paid to second party in the following manner until second party has received the total sum of $25,000.00; and after said $25,000.00 has been so paid to second party, one-half of said net production shall be paid to second party until second party has received the additional sum $50,000.00. The said payment for said net production, as herein provided, shall be paid as follows: On or before the twentieth day of the month, first party shall pay to second party, in cash, for the said net production produced, saved and sold during the preceding calendar month on the basis of the price publicly offered and paid by the Standard Oil Company of California in said field for oil of like gravity and quality.

"It is further agreed and understood that in the event sufficient quantity of oil is not obtained from said well or wells on which said $25,000.00 is expended to fully pay $75,000.00 to second party within a period of six (6) months from the date of this agreement, second party shall have the right and option to furnish additional money to first party to be expended under the same terms and conditions as said sum of $25,000.00, and first party shall repay said further sum so advanced in the same manner, at the same times and to the same extent as provided herein for said sum of $25,000.00. But it is agreed that in the event second party does not elect to furnish any additional funds to complete said operations to procure an additional quantity of oil, and first party should elect to expend additional funds for said purpose, then second and first parties, out of said net production, shall pro rate the said net production so produced, sold and disposed of, in proportion to the amount furnished by second party and the amount furnished by first party for said purpose, until each has received the amount so invested, and the pro-ration of the one-half of the net production shall likewise be pro-rated in the same manner until second party has received said additional sum of $50,000. Said pro-ration of the funds so received to be based upon the net price publicly offered and paid by the Standard Oil Company of California in said field for oil of like gravity and quality.

"It is further agreed that first party shall have no obligation whatever to return or repay second party any funds furnished by second party, except out of oil produced, sold and disposed of from wells on which said second party's monies have been expended.

"All of the terms, conditions and provisions of this agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal representatives, successors and assigns of the respective parties hereto."

Each of the two other contracts contains the following additional paragraphs:

"Tenth: It is further understood and agreed that the relationship of the parties hereto shall be that of joint adventurers and shall in no manner or form be construed to be a partnership and/or limited partnership relationship; that the advancement of funds herein by Second Party shall in no manner or form be construed to be a loan from Second Party to First Party, and that the same is purely and entirely a joint adventure.

"It is further understood and agreed that there shall be no obligation on the part of the Second Party to advance any other funds than as may be provided for herein; that no obligation for the expense of drilling said well or wells shall be assumed by party of the second part other than as herein set forth, and First Party agrees to save Second Party harmless from any and all obligations that may hereafter arise under and by virtue of said agreement with regard to claims for labor, material or other expenses of the construction and/or drilling of said well and/or that may arise by reason of the workmen's compensation and safety laws and/or any public liability, or otherwise; and First Party agrees to pay, disburse and discharge any and all just claims that may arise under and by virtue of the construction and/or drilling of said well and/or wells when and as the same shall fall due."

These other two contracts also contain a paragraph setting forth that, when Fisher shall have received his original investment, plus an amount equal to twice the investment, "his interest in and to said well and/or wells and to the oil produced therefrom shall cease and terminate." Both these contracts are denominated "Joint Adventure Agreements." One of them recites that Fisher is to advance $50,000, and the other that he is to furnish $60,000.

In the petition of the receiver, for an order as to the manner in which he shall handle these three contracts, it is stated that the "contingent liability remaining" on these contracts is composed of the sums of $19,569.87, $149,965.26, and $115,500.30, or a grand total of $285,035.43.

In his brief, counsel for appellee asserts that the latter "does not claim a lien upon the oil produced by the wells covered by the contracts under consideration. He owns the oil itself to the extent provided in the contracts."

This contention is sufficiently disposed of by the case of In the Matter of Lathrap (C. C. A.) 61 F.(2d) 37, decided by this court August 10, 1932. Present title to oil in place cannot be transferred, nor can any sale of such oil be made without the right to go upon the land to extract it. Fisher had no such right.

In our view, Fisher was a joint adventurer with the oil company. As we have seen, two of the contracts so state. While the terminology of the parties is not conclusive, it assuredly is one of the elements to be considered in construing a contract. "If the transaction was evidenced by an instrument in writing, the intention of the parties is to be determined primarily by a reference to the provisions thereof." 22 Cal. Jur., § 34, p. 948, "Sales."

In the instant case, however, we are not confined to mere terminology in determining that the contracts are of joint adventure. The entire instruments themselves, as well as the admissions in the briefs tend to establish such relationship. Near the close of the brief filed on behalf of Fisher this candid statement appears: "The appellee took a 'long chance' in the hope of realizing an extraordinary profit; the company had everything to gain and it risked nothing."

From the contracts themselves, it is clear that the appellee was to receive—if all went well—clear profit amounting to 200 per cent. of his investment, in addition to his original outlay.

The courts are less interested in safeguarding "extraordinary profits" than they are in enforcing the "ordinary" claims of general creditors, who have furnished labor or material at a normal profit. Such creditors should be preferred over persons who have, in the language of counsel, taken a "long chance"; that is to say, a "gambler's chance." Sound public policy demands that the creditor should have preference over the speculator.

The lower court should have ordered the trustee to pay the general creditors of the company before distributing any of the assets to the appellee. For that reason, the order is reversed.