226

## CONSOLIDATED ROYALTIES, Inc., et al.
## v. ASHTON et al.

### No. 10088.

Circuit Court of Appeals, Ninth Circuit.

Dec. 15, 1942.

Fleming & Robbins and C. S. Tinsman, all of Los Angeles, Cal., for appellants.

Raphael Dechter and Russell B. Seymour, both of Los Angeles, Cal., for appellee.

Charles Z. Walker, of Long Beach, Cal., as amicus curiæ on behalf of appellant.

Joseph J. Rifkind, of Los Angeles, Cal., as amicus curiæ in support of appellee.

Before DENMAN, MATHEWS and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

This appeal is from a judgment modifying and affirming, as modified, an order of a referee in bankruptcy which, as modified, requires Standard Oil Company of California, hereafter called Standard, to pay the trustee of the bankrupt estate of Deep Hole Drilling Corporation, hereafter called Deep Hole, moneys claimed by appellants— Consolidated Royalties, Incorporated, hereafter called Consolidated, and C. B. Callahan. The facts are as follows:

On September 30, 1938, Henry C. Hopkins and Clarence V. Hopkins leased to Twin Oil Company two acres of land in Los Angeles County, California. On December 10, 1938, the lease was assigned to Deep Hole. Thereafter Deep Hole drilled on the leased land an oil well known as Well No. 1. The well was completed on February 5, 1939. On February 1, 1939, Deep Hole and Standard made a contract whereby Standard agreed to purchase, and Deep Hole agreed to sell and deliver, all oil produced from the well, delivery to be made into Standard's pipeline, title to pass to Standard upon such delivery. All oil produced from the well was in fact so purchased, sold and delivered. On March 27, 1939, Deep Hole executed and delivered

two assignments—one to Consolidated and one to Callahan. The assignment to Consolidated was, in part, as follows: " * * * For and in consideration of the sum of Ten ($10) Dollars, and other good and valuable consideration, receipt of which is hereby acknowledged, Deep Hole * * * does hereby sell, assign, transfer and set over unto Consolidated * * * an overriding royalty interest of five (5%) per cent. of the oil produced, saved and sold * * * from [Well No. 1], from and including March 1, 1939, subject to all the terms, covenants and conditions of [the lease]. Said royalty interest shall not be chargeable with any operating cost of the well or lease * * *. Monthly accounting shall be made by assignor [Deep Hole] to assignee [Consolidated] * * *. Assignor agrees that it will execute and deliver to assignee all division orders directed to purchasers of oil * * * produced, saved and sold from said well, necessary or required to enable the assignee to receive direct from such purchasers moneys due [assignee] hereunder. The said assignor hereby warrants that it is the owner of the interest herein conveyed, and that the same is not subject to any incumbrances whatsoever. The assignor hereby guarantees that it will not sell, assign, transfer or convey its estate, or any interest therein, in the [leased land] without first making adequate provision for the protection of any interest holders * * *."

The assignment to Callahan was similar except that the interest assigned to him was 7% instead of 5%. On March 29, 1939, Deep Hole and Callahan executed and delivered to · Standard an order directing Standard to pay Consolidated 12% (Consolidated's 5% and Callahan's 7%)[1] of the proceeds of all oil produced from Well No. 1 and purchased by Standard. Standard complied with the order until August 31, 1939.

At the time of the assignments Deep Hole was solvent, but owed certain debts incurred by it in drilling Well No. 1. Part of that indebtedness was to Howard Supply Company, hereafter called Howard. Prior. to the execution of the assignments Howard agreed not to interfere with appellants' rights thereunder, and Deep Hole

informed appellants that its remaining indebtedness ($4,000) would be paid by it from the money ($11,400) which it was to, and did, receive for the assignments. Actually, however, although Deep Hole received the $11,400, it never paid any of its above mentioned debts.

Other debts were incurred by Deep Hole in drilling a well known as Well No. 2,[2] which failed to produce and was abandoned. The debts incurred in drilling Well No. 2 were incurred after March 27, 1939 (the date of the assignments), and were never paid.

On September 23, 1939, Deep Hole filed a petition under chapter 11 (§§ 301–399) of the Bankruptcy Act, 11 U.S.C.A. §§ 701–799. The case was referred to a referee (Samuel W. McNabb) and Harry Ashton was appointed receiver. On April 22, 1940, Deep Hole was adjudged a bankrupt and Ashton was appointed trustee. Ashton, as receiver and (later) as trustee, retained possession of and operated Well No. 1, produced oil therefrom and delivered the oil to Standard pursuant to the contract between Deep Hole and Standard, but Standard never paid appellants or anyone else for appellants' 12% of the oil produced from the well and delivered to Standard after August 31, 1939. For appellants' 12% of the oil delivered between August 31, 1939, and April 30, 1940,[3] Standard owes $846.08. For appellants' 12% of the oil delivered after April 30, 1940, Standard owes an amount which the record does not disclose.

On May 15, 1940, appellants brought an action against Standard in a State court of California to recover the $846.08. On May 17, 1940, the trustee filed with Referee McNabb a petition stating, in substance, that one of the assets of the bankrupt estate was Well No. 1; that the oil produced therefrom had been and was being sold to Standard; and that appellants claimed some right, title or interest in or to the oil and its proceeds and were threatening to sue Standard for portions of the proceeds.[4] The petition prayed, and Referee McNabb thereupon issued, an order (1) restraining appellants, until further order of the court, from instituting or prosecuting any action

---

[1] For the purpose of collecting Callahan's 7%, Consolidated was Callahan's agent.

[2] Appellants had, but did not exercise, options to purchase interests in Well No. 2 similar to their interests in Well No. 1.

[3] Part of this oil was delivered before September 23, 1939, part of it afterwards.

[4] The trustee apparently was unaware that appellants had already sued Standard for a portion ($846.08) of the proceeds.

in respect to the oil or the proceeds and (2) requiring appellants and Standard to show cause why Standard should not be directed to pay the proceeds to the trustee, and why appellants should not be adjudged and decreed to have no right, title or interest in or to the oil or the proceeds.

Appellants answered, pleading the assignments and asserting that they (appellants) were the owners of 12% of all oil produced from Well No. 1 and 12% of the proceeds of all oil so produced, and denying that the bankrupt estate or its trustee had any right, title or interest in or to said 12%. Standard did not answer. The case was heard upon a stipulation of facts. The stipulated facts were as stated above. Referee McNabb, after hearing the case, filed an opinion and directed counsel to prepare findings of fact, conclusions of law and an order. That was done. Before it was done, however, Referee McNabb died, and the case was referred to another referee (Hubert F. Laugharn). It was thereupon stipulated that the findings, conclusions and order should be signed by Referee Laugharn, and they were so signed on November 26, 1941.

The facts were found to be as stated above. The referee's conclusions were (1) that "the rights and interests of [appellants] in and to the oil produced, saved and sold * * * from said Well No. 1 are subject and subordinate to the rights and interests of the trustee to the extent of $4,000, being the indebtedness incurred and now unpaid in the drilling of said well prior to the purchase by [appellants] of their interest in said well, with the exception of the claim of Howard," and (2) that "the proceeds from said 12%, including all proceeds after April 30, 1940, in addition to said sum of $846.08 in the hands of [Standard], are the property of the said trustee, free and clear of any right, title, interest or claim on the part of [appellants]." The order was as follows: "It is therefore ordered that the right, title and interest of [appellants] in and to twelve per cent (12%) of the oil produced, saved and sold * * * from Well No. 1, and in and to the funds in the hands of [Standard] in the amount of $846.08, plus such further proceeds as have accrued since April 30, 1940, is subject and subordinate to the $4,000 in unpaid claims of creditors arising in the drilling of Well No. 1, exclusive of the claim of Howard * * *. Should said claims be paid to the extent of $4,000, the interest of [appellants] in and to said Well

No. 1 shall thereupon be free and clear of any and all other claims of said bankrupt estate, and the 12% of the proceeds from the production of said well, evidenced by [appellants'] royalty assignments, shall thereafter be paid to [appellants]. It is further ordered that [Standard] shall pay over to the trustee all proceeds from said 12% until further order of a court of competent jurisdiction. It is further ordered that [appellants] be, and hereby are, restrained from prosecuting any action in any court in respect to the proceeds of production from said property unless leave from this court first be had."

On petition of appellants, the order was reviewed and judgment was thereupon entered as follows:

"1. That the findings of fact of the referee in bankruptcy be and the same are hereby adopted by this court * * *.

"2. It is additionally found that for the period from the last payment of royalty for the month of August, 1939, to September 23, 1939, no jurisdiction in the bankruptcy court was established, and said court, as to said period and as to the amount of interest or royalty or share accruing to [appellants] exclusively during said period, had no jurisdiction thereof.

"3. That the conclusions of law of the referee in bankruptcy be and the same are hereby adopted by this court * * * with the modification that the proceeds from said 12% of the oil produced, saved and sold from said Well No. 1 and impounded by [Standard] during the period from the last payment of royalty for the month of August, 1939, to September 23, 1939, are the property of [appellants], and the bankruptcy court has no jurisdiction of such portion of the funds impounded or on deposit with [Standard].

"4. That the order of the referee dated November 26, 1941, with such modifications, be and the same is hereby confirmed."

From that judgment this appeal is prosecuted.

The trustee's controversy with appellants involved three funds. The first, hereafter called fund (a), consisted of money owing by Standard for 12% of the oil produced from Well No. 1 and delivered to Standard between August 31, 1939, and September 23, 1939. The second, hereafter called fund (b), consisted of money owing by Standard for 12% of the oil so produced and delivered between September 23, 1939, and April 30, 1940. The third, hereafter

called fund (c), consisted of money owing by Standard for 12% of the oil so produced and delivered after April 30, 1940. The record shows that funds (a) and (b) aggregated $846.08, but it does not show the several amounts or the aggregate amount of the three funds.

■ The trustee contended that all the funds belonged to the bankrupt estate, and that appellants had no right, title or interest in or to any of the funds. Appellants contended that all the funds belonged to them, that the bankrupt estate had no right, title or interest in or to any of the funds, and that the bankruptcy court had no jurisdiction of any of the funds. As to fund (a), the court, by its judgment, rejected the trustee's contention and upheld appellants' contention. That part of the judgment is not complained of and hence is accepted by us as correct.

As to funds (b) and (c), the court, by its judgment, upheld the trustee's contention in part, rejected it in part, upheld appellants' contention in part and rejected it in part. In effect, the judgment holds that, for the purpose of paying creditors' claims aggregating $4,000, and for that purpose only, funds (b) and (c) belong to the bankrupt estate, and that, for all other purposes, they belong to appellants. Appellants contend that funds (b) and (c) belong to them for all purposes, and that creditors' claims are not payable therefrom.

■ Upon what ground or theory creditors' claims aggregating $4,000 were held to be payable from funds (b) and (c) is not very clear. The court did not find or hold, nor was there any basis for finding or holding, that these creditors had a lien on funds (b) and (c). The case was heard upon a stipulation of facts. There was no other evidence. The stipulation says nothing about a lien. It states that Deep Hole's indebtedness to these creditors was "incurred in the drilling of Well No. 1," but it does not state how the indebtedness was incurred or what it consisted of, or state any fact warranting an inference that a lien arose. Much less does it show that such lien, if any, attached to the oil produced from the well or to the proceeds of such oil.

The court did not hold, nor was there any basis for holding, that the assignments—which, appellants say, entitle them to funds (b) and (c)—were void as to these creditors. The parties stipulated, and the court found, that Deep Hole was solvent when the assignments were made, and that appellants paid for the assignments a consideration of $11,400. There was and is no claim or contention that the consideration was inadequate.

■ The court held that the rights of appellants in and to funds (b) and (c) were subordinate to the claims of these creditors, but it did not say why. There was, we think, no basis for the holding. True, a bankruptcy court may, when equity and fairness require, subordinate the claim of one creditor of a bankrupt to the claims of other creditors. Pepper v. Litton, 308 U.S. 295, 303-312, 60 S.Ct. 238, 84 L.Ed. 281. Appellants, however, are not and never claimed to be creditors of Deep Hole. They claim funds (b) and (c) as owners, not as creditors. No question of subordinating or preferring one creditor to another arises in this case.

The trustee cites, in support of the court's holding, In re Lathrap, 9 Cir., 61 F.2d 37, 38. In that case, Lathrap, a lessee of land under an oil and gas lease, drilled an oil well thereon and, while drilling the well, executed assignments each of which was, in part, as follows: " * * * In consideration of the sum of Ten ($10.00) Dollars; * * * [Lathrap] does hereby sell, assign, transfer and set over unto [the assignee] * * * a royalty interest equivalent to [a specified percentage] of the gross proceeds received from the sale of one hundred per cent (100%) of the oil * * * produced * * * from the well now being sunk on said [leased land] under and by virtue of said Lease or any assignment thereof; said proceeds * * * shall be disbursed through a reputable bank *. * * and any and all purchasers of oil * * * produced from said well are hereby authorized and directed to pay said royalty direct to said Bank, less the hereinafter mentioned deduction. [Lathrap] agrees * * * that this interest is free and clear of any drilling or deepening expense, but shall be subject to the deduction and payment (out of said proceeds) of the sum of Ten ($10.00) Dollars per month, for each One per cent (1%) hereby assigned, which sum shall be expended solely in the operation and maintenance of said well and for no other purpose; * * *."

Lathrap's well was completed, oil was produced and sold therefrom, Lathrap was adjudged a bankrupt, a trustee was appointed and, thereafter, the proceeds of the oil were paid to the trustee. Lathrap's assignees claimed to be owners of part of the pro·

ceeds. The bankruptcy court held, and this court affirmed the holding, that the assignees' claims were subordinate to the claims of Lathrap's creditors. Appellants contend that the Lathrap decision was overruled in Laugharn v. Bank of America, 9 Cir., 88 F.2d 551. However, we need not consider that contention, for if not overruled, the Lathrap decision is inapplicable here, for the following reasons:

In the Lathrap case, the assignees and the assignor (Lathrap) were found to be coadventurers, coinvestors and participants in a common enterprise. That was the basis of the Lathrap decision. In the case at bar, there was no such finding[5] nor any basis for such a finding. Here the parties stipulated, and the court found, that the assignees (appellants) did not at any time participate in the conduct, management or business of the assignor (Deep Hole). It was further stipulated and found that Deep Hole had completed its well, had contracted for the purchase and sale of oil produced therefrom, had produced and was producing such oil, and was selling and delivering it to the purchaser (Standard) when the assignments here involved were executed. In the Lathrap case, the assignments were executed before the well was completed and, of course, before any oil was produced or sold therefrom. Furthermore, the terms and provisions of the Lathrap assignments differ materially from the terms and provisions of the Deep Hole assignments, as we shall now show.

Each of the Lathrap assignments declares that the assignor (Lathrap) does thereby "sell, assign, transfer and set over unto [the assignee] a royalty · interest equivalent to [a specified percentage] of the gross proceeds received from the sale" of oil produced from the Lathrap well; provides that this interest shall be subject to a deduction of $10 a month for each 1% assigned, which sum shall be expended in the operation and maintenance of the well; and provides that the gross proceeds of the oil shall be paid to and disbursed through a bank. The interest thus "sold, assigned, transferred and set over" was not an interest in oil. All that the assignee acquired by the assignment was the right to receive a sum of money "equivalent to" a specified percentage of the gross proceeds which might thereafter be received for oil produced and sold from the Lathrap well, less the deduction mentioned.

Each of the Deep Hole assignments declares that the assignor (Deep Hole) does thereby "sell, assign, transfer and set over unto [the assignee] an overriding royalty interest of [a specified percentage] of the oil produced, saved and sold" from Well No. 1; provides that this interest shall not be chargeable with any operating cost of the well; and obligates Deep Hole to execute such orders as may be necessary to enable the assignee to collect from the purchasers of oil produced from the well the assignee's share of the proceeds of such oil. The interest thus "sold, assigned, transferred and set over" was an interest in oil —an interest consisting of a specified percentage of all oil produced, saved and sold from Well No. 1. Thus appellants (Deep Hole's assignees) became the owners of 12% of all oil so produced, saved and sold and, as such owners, were entitled to the proceeds of said 12%, including funds (a), (b) and (c).

Whether, as contended by the trustee, these assignments were securities, or whether, as contended by appellants, they were conveyances of incorporeal interests in real property, we have no occasion here to decide; for, regardless of what the assignments are called, their effect was and is as stated above.

The judgment is modified so as to reverse the referee's order of November 26, 1941, and hold that funds (a), (b) and (c) hereinabove mentioned—that is to say, all proceeds of appellants' 12% of the oil produced, saved and sold from Well No. 1 since August 31, 1939—are the property of appellants, and that neither the estate of Deep Hole Drilling Corporation, bankrupt, nor the trustee thereof has any right, title or interest in or to said proceeds.

As thus modified, the judgment is affirmed.

---

[5] Referee McNabb's opinion stated: "I am of the opinion that [appellants] are coadventurers with [Deep Hole] in so far as Well No. 1 is concerned." That opinion, however, was not embodied or expressed in the findings, the conclusions or the referee's order (signed by Referee Laugharn) or in the judgment here appealed from.