[Civ. Nos. 19058, 19060.   Second Dist., Div. Two.   Sept. 24, 1952.]

COUNTY OF LOS ANGELES, Respondent, v. CONTI-
NENTAL CORPORATION (a Corporation), Appellant.

[Civ. No. 19059.   Second Dist., Div. Two.   Sept. 24, 1952.]

COUNTY OF LOS ANGELES, Respondent, v. CONTI-
NENTAL DEVELOPMENT CORPORATION (a Cor-
poration), Appellant.

George H. Emerson for Appellants.

Harold W. Kennedy, County Counsel, and Gordon Boller, Deputy County Counsel, for Respondent.

McCOMB, J.—From a judgment in favor of plaintiff and against defendant in the above entitled actions which were tried before the court without a jury, the three actions having been consolidated for the purpose of trial, defendants appeal.

The Honorable Julius V. Patrosso, the trial judge, prepared and filed an exhaustive and splendid opinion which fully sets forth the facts, appellant's contentions and the law applicable thereto. Since we have reached the same conclusions as the learned trial judge, no useful purpose would be served by our rephrasing the opinion prepared by Judge Patrosso. Therefore we adopt the same with minor modifications as the opinion of this court. It reads as follows:

"By these actions, which have been consolidated for the purpose of hearing, plaintiff seeks to recover taxes levied and assessed, purportedly pursuant to section 107 of the Revenue and Taxation Code, against the rights vested in the defendant under an agreement hereinafter to be described in greater detail, executed by and between the Los Angeles County Flood Control District and the defendant, whereunder the latter was granted the right to drill for and produce oil, gas, and other hydrocarbon substances upon and from the land and premises therein described belonging to the district. Pursuant to stipulation of counsel, the cases have been submitted for decision upon the pleadings, supplemented by an agreed statement of facts and the only questions presented are the validity of the three defenses pleaded by the defendant, namely, (1) the statute of limitations, (2) res judicata, and (3) that the rights under the agreement in question are not of such nature or character as to be subject to taxation.

## "The Statute of Limitations

"The first question which presents itself is the plea of the statute of limitations which defendant has interposed to plaintiff's various causes of action. In this connection it is to be noted at the outset that all of the complaints herein, as well as the various amendments thereto, were filed within three years of the date upon which the taxes sought to be recovered became delinquent, with the following exceptions:

"The second amended complaint in action No. 463871 whereby recovery was, for the first time, sought for taxes levied and assessed for the years 1943 to 1947, inclusive, was

filed more than three years after the taxes for the fiscal years 1943 and 1944 became delinquent. In action No. 484748 the amended complaint seeking recovery for taxes levied and assessed for the fiscal years 1943 and 1944 was filed more than three years after such taxes became delinquent.

"Counsel are not only in disagreement as to the applicable period of limitation but also as to when a cause of action for the recovery of taxes accrues; plaintiff asserting that the applicable period of limitation is the 4-year period prescribed by subdivision (2) of section 337 relating to actions upon a book account, in which instance the time begins to run from the date of the last item or entry in the account; while counsel for the defendant contends (1) that the applicable statute is the 3-year period prescribed by subdivision (1) of section 338, and (2) that the action thereunder accrues not later than July 1 of the year for which the taxes sought to be recovered were levied. Additionally, however, counsel for plaintiff asserts that, if subdivision (2) of section 338 is here applicable, the period of limitation does not commence to run until the date when the taxes sought to be recovered become delinquent.

"While counsel for plaintiff frankly acknowledges that it has uniformly been held in this state 'that a personal action for the recovery of taxes is based upon a liability created by statute within the meaning of section 338 Code of Civil Procedure (16 Cal.Jur. p. 475, § 77 and cases there cited), he nonetheless urges that in none of the cases so declaring did the court have occasion to consider the precise question here presented.

"The term 'book account' has been defined, generally, as 'a detailed statement, kept in a book, in the nature of debit and credit, *arising out of contract or some fiduciary relation.*' (*Wright* v. *Loaiza,* 177 Cal. 605, 606 [177 P. 311].) While the books containing the assessment roll of the county of Los Angeles may be said to constitute a detailed statement in the nature of the debit and credit, an assessment of taxes cannot be said to arise either out of contract or a fiduciary relation. The obligation to pay taxes is clearly a liability created by statute, for in the absence of a statute authorizing the levy of a tax, no liability therefor exists. Thus, in *State* v. *Poulterer,* 16 Cal. 514, 529, it was held that, in the absence of an express provision imposing personal liability for the tax or authorizing the filing of suit to recover the same, no action may be maintained therefor.

█ Nor is the nature of the liability altered by the mere fact that evidence of the assessment of the tax is to be found in the assessment roll which in turn is included within a book or books. If counsel's position is correct, then the period of limitation prescribed for enforcing a liability created by statute might, in every instance, be extended for an additional period of one year merely by the mechanical act of entering the same in a book. The court does not believe that the Legislature contemplated such a result.

"A similar question, in principle, was presented in the case of *People* v. *California Safe Deposit & T. Co.*, 41 Cal. App. 727 [183 P. 289]. There the intervenor Smith sought to recover accrued installments upon a written contract, and in order to avoid the bar of the statute of limitations undertook to predicate his claim upon a book account rather than upon the written agreement. In answer to this contention the court said (p. 732):

" 'Appellant further contends that his cause of action is based upon a book account, in which the last entry was made on July 7, 1917, and, therefore, his cause of action is not barred. The alleged book account was a memorandum kept by appellant, in which he charged the amounts accruing under the contract and credited the several payments made, including that collected by him as the result of the judgment in the former suit above referred to. Appellant's alleged cause of action is based upon his contract and not upon this account. The writing is a mere memorandum of debts accruing from an entirely independent source. In *Mercantile Trust Co.* v. *Doe*, 26 Cal.App. 246, 253 [146 P. 692], a number of definitions of a book account, as applied to the statute of limitations, are given among which is the following: "In 1 Ruling Case Law, page 207, it is said: 'The expression "outstanding and open account" has a well-defined and well-understood meaning. In legal and commercial transactions it is an unsettled debt arising from items of work and labor, goods sold and delivered, and other open transactions, not reduced to writing, and subject to further settlement and adjustment. It is usually disclosed by the account books of the owner of the demand, and does not include express contracts or obligations which have been reduced to writing, such as bonds, bills of exchange, or promissory notes.' " ' '

█ "So here, plaintiff's cause of action is based upon the liability, created by statute, arising upon the assessment of the tax, and not upon the entry of the assessment thereof

on the assessment roll, it being held that a cause of action to recover taxes accrues upon the assessment thereof, or upon the date payment becomes delinquent, and the running of the statute of limitations with respect to an action to recover the same is not tolled until the entry of the tax upon the assessment roll. (*County of Los Angeles* v. *L. A. Junk Co.*, 8 Cal.App.2d 136 [47 P.2d 309].)

■ "Not only for the reasons stated, but in the absence of any authority in California or elsewhere supporting the contention of counsel for plaintiff, and in view of the previous decisions of our courts declaring that actions to enforce the payment of taxes are controlled by the three-year period prescribed by subdivision (1) of section 338, the court concludes that this section is applicable here.

"Thus we are brought to a consideration of the question as to when a cause of action to recover taxes accrues. ■ As a general rule, subject to exceptions not here deemed applicable, the statute of limitations does not commence to run until a cause of action accrues, which is ordinarily when the liability matures, so that suit may be based thereon. (16 Cal. Jur. p. 488, § 91.) In order to determine when suit may be commenced to enforce payment of taxes, we turn to the provisions of the Revenue and Taxation Code.

"Preliminarily, it is to be noted that, prior to 1943, taxes assessed against possessory interests in real property were not secured by a lien and were entered upon the unsecured roll, but by an amendment effective that year it was provided:

" 'Leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits *à prendre*, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll.' (Rev. & Tax. Code, § 107.)

"Consequently, from and after the effective date of said amendment taxes on interests of the character therein described were entered upon the secured roll.

"With respect to taxes on the unsecured roll, Section 2901, Revenue and Taxation Code, provides that they are due on the lien date (the first Monday in March), and become delinquent on September 1 (Rev. & Tax. Code, § 2922).

214

"Taxes on the secured roll are due, as to personal property and one-half of the real property tax, on November 1, and as to the second half of the taxes on real property on January 20 (Rev. & Tax. Code, §§ 2605-2606), and become delinquent, as to the November 1 installment, on December 5, and, as to the second installment, on April 20. (Rev. & Tax. Code, §§ 2617-2618.)

"With respect to the time when suit may be instituted to recover taxes assessed against the interests described in section 107 (quoted above), that section provides that 'suit may be brought against an assessee of such taxes *in the event of delinquency in the payment thereof*;' while section 3003 Revenue and Taxation Code provides:

" 'Where delinquent taxes or assessments are not a lien on real property sufficient, in the judgment of the assessor, or the board of supervisors, to secure the payment of taxes or assessments, the county may sue in its own name for the recovery of the *delinquent* taxes or assessments, with penalties and costs.' (Emphasis supplied.)

"In *Town of Dixon* v. *Mayes,* 72 Cal. 166, 170 [13 P. 471], it was held that an action for the recovery of taxes could not be maintained until the payment of the same became delinquent, and it has likewise been held that where a statute prescribes the conditions upon which actions may be brought to enforce the payment of such taxes, a compliance therewith is essential. (*People* v. *Ballerino,* 99 Cal. 598, 600 [34 P. 330].)

"As we have seen, both sections 107 and 3003 of the Revenue and Taxation Code, authorizing the institution of suit to enforce the payment of taxes, provide that suit may be instituted 'in the *event of delinquency*' or with respect to 'delinquent' taxes. It would therefore appear that no action to enforce payment of such taxes could be maintained under either section prior to the date when they became delinquent. From this it necessarily follows that the statute of limitations would not commence to run until the date of delinquency, when, for the first time, action to enforce payment thereof may be maintained.

"In the foregoing discussion the court has not overlooked the decision in *County of Los Angeles* v. *L. A. Junk Co.,* 8 Cal.App.2d 136 [47 P.2d 309], upon which reliance is placed by counsel for defendant, and wherein appears the following language:

" 'The cause of action must be held to have accrued not later than the first Monday in July, 1930 and was delinquent not later than December 5, 1930. (Pol. Code, § 3746.)'

"It would appear obvious, however, that the use of the words 'cause of action' in the passage from the opinion last above quoted was inadvertent. To say that a cause of action becomes 'delinquent' upon a stated date is certainly an unusual expression in legal parlance, and that it was not used as an equivalent for the word 'barred' is readily apparent, for under no possibility could it rightly be said that a cause of action to recover taxes which accrued on the first Monday in July of a given year would be barred on December 5 of the same year. What the court undoubtedly meant to say was that *liability* for the payment of the' taxes there sought to be recovered accrued not later than 'the first Monday in July' and that *payment* thereof 'was delinquent not later than December 5, 1930.' Moreover, the court's ultimate determination that the action was barred was in no wise dependent upon whether it accrued on the first Monday in July, 1930 or on December 5, 1930, for more than three years intervened between either date and the filing of suit.

"From the foregoing it follows that as to actions Nos. 463871 and 484748 the plea of the statute of limitations must be sustained only in so far as the same seek recovery for the taxes for the fiscal years 1943 and 1944. As to all other causes of action therein as well as to action No. 574345, the plea of the statute of limitations is not sustained.

## *"Res Judicata*

"The plea of res judicata interposed by the defendant is predicated upon the judgments rendered in two previous actions in this court. The first, No. 434964, in which the defendant herein and Los Angeles County Flood Control District were petitioners and Roger W. Jessup, as chairman of the Board of Supervisors of Los Angeles County Flood Control District, was respondent (hereinafter sometimes referred to as the mandate proceeding), was one wherein the petitioners sought to compel the execution by the respondent of the contract here involved between the flood control district and the defendant, and under which the alleged rights sought to be taxed were granted to or conferred upon the defendant. The petition alleged that the execution of the agreement had been duly authorized by the board of supervisors of the flood control district, which by resolution had

directed and instructed the respondent as chairman to execute the same on its behalf, and that the respondent failed and refused to do so.

"In answer to the petition the defendant interposed an answer admitting substantially all of the allegations of the petition, but alleging as a defense thereto that his refusal to so execute the agreement was based upon the ground that the same 'constitutes a lease of the property of the Los Angeles County Flood Control District; that the Board of Supervisors of the Los Angeles County Flood Control District failed, refused and neglected to comply with any of the provisions mentioned in section 4041m of the Political Code of California, as incorporated by section 3 in the Flood Control Act, relating to the leasing of property of said district.' (Answer, p. 5, lines 17-25.)   Other defenses were interposed by the answer but they are deemed immaterial here.

"By its findings in that proceeding the trial court found 'that all of the allegations of respondent's fifth, separate, affirmative defense (that quoted above) are untrue, except that it is true that the board of supervisors of the Los Angeles County Flood Control District did not, prior to the approval of said agreement referred to in the petition herein and the order of the chairman to execute the same, comply with any of the provisions of section 4041m of the Political Code, the court expressly finding that section 3 of the Los Angeles County Flood Control Act, relating to the powers and duties of the board of supervisors of said district, does not incorporate or make applicable by reference, or otherwise, any portion of the Political Code of the State of California, the court further finding that the said agreement constitutes a drilling agreement between the respective parties thereto for the drilling, developing and operating for the production, extraction, removal and disposal of oil, gas, and other hydrocarbon substances from the said property of the Los Angeles County Flood Control District, as referred to in the said drilling agreement and in the petition herein.'   (Findings, par. X, pp. 2-3.)

"The second judgment relied upon was that rendered in action No. 442081, wherein the defendant herein and Los Angeles County Flood Control District were plaintiffs and the city of Long Beach and various of its officers were defendants, and which will hereinafter be referred to as the Long Beach action.   By that proceeding the plaintiffs sought an injunction to restrain the enforcement of certain ordi-

nances of the city of Long Beach regulating the drilling of oil wells within the corporate limits thereof, as well as others imposing license fees in connection with oil drilling operations, in so far as the same were sought to be enforced against the plaintiffs therein with respect to operations upon the real property which is the subject of the contract with which we are here involved and which was likewise the subject of the previous mandate proceeding.

"Briefly stated, the complaint alleged that certain of the ordinances therein referred to, as applied to the plaintiffs and the real property in question, were unreasonable, arbitrary, discriminatory and invalid, and as to others plaintiffs were excluded from the terms thereof. By its findings in that proceeding the trial court found that, by virtue of certain proceedings taken by the city of Long Beach in the mandate proceeding, previously referred to, that judgment constituted a final, binding and conclusive adjudication upon all of the parties to the Long Beach proceeding; that the ordinances therein referred to, insofar as they prohibited the drilling of oil wells upon any portion of the land of the plaintiffs, were discriminatory and invalid; and that certain ordinances imposing the fees for drilling operations were not applicable to the Los Angeles County Flood Control District, which, by necessary implication, was exempted from the operation thereof.

"Among the conclusions of law the court found that the provisions of certain ordinances requiring the execution, filing and maintaining of indemnity bonds in connection with drilling operations, excluded from their application, by necessary implication, the Los Angeles County Flood Control District 'and its agent,' Continental Corporation, the defendant in the instant proceedings.

"Do either or both of these prior judgments constitute an adjudication that the agreement executed between the Flood Control District and the defendant herein did not constitute an oil and gas lease or one which granted to or conferred upon the defendant a 'possessory interest' in real property, and therefore subject to taxation under the Constitution and laws of this state, and, if so, are the same binding upon the county of Los Angeles in the instant proceedings?

"Section 1908, Code of Civil Procedure, reads in part as follows:

" 'The effect of a judgment or final order in an action or special proceeding before a court or judge of this state,

or of the United States, having jurisdiction to pronounce the judgment or order, is as follows: . . .

" '2. In other cases, the judgment or order is, in respect to the matter directly adjudged, conclusive between the parties and their successors in interest by title subsequent to the commencement of the action or special proceeding, litigating for the same thing under the same title and in the same capacity, provided they have notice, actual or constructive, of the pendency of the action or proceeding.'

"In *Bernhard* v. *Bank of America*, 19 Cal.2d 807 [122 P.2d 892], our Supreme Court tersely sets forth the tests to be applied in determining the validity of a plea of res judicata as follows (p. 813):

" 'In determining the validity of a plea of res judicata three questions are presented: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?'

"Inasmuch as no appeal was taken from either judgment, and each case was determined upon its merits, the second question or test suggested by the court need not concern us here.

"Turning our attention to the first, namely, identity of issue, it would appear reasonably clear that the issue presented in the instant cases was neither presented nor decided in either of the judgments relied upon. The issue here is whether or not the agreement executed between the Los Angeles County Flood Control District and the defendant herein constitutes an oil or gas lease or vests in the defendant a possessory interest in real property subject to taxation. From what has been said, it is apparent that no such issue was involved or determined in the mandate proceeding. The issue there presented was whether it was within the power of the Los Angeles County Flood Control District to enter into the contract in question without prior compliance with the procedure prescribed by section 4041m of the Political Code, and the only determination made by the Court in that proceeding was that the provisions of this section were not binding upon or applicable to the Los Angeles County Flood Control District. True, in its findings, the trial court in that proceeding characterized the document as 'a drilling agreement.' But no attempt was made by the court to de-

termine the legal effect of the document or the nature of the rights or interests thereby conferred upon and vested in the defendant. To say that a document constitutes 'a drilling agreement' is not tantamount to saying that it is not an oil or gas lease, or that the effect thereof is not to vest in the operator an estate in real property or a possessory interest therein which is subject to taxation.

"The issue involved in the Long Beach proceeding is even further removed from that tendered here. Whether or not the ordinances of the city of Long Beach therein involved were constitutional or were applicable to the Los Angeles County Flood Control District or the defendant did not necessarily involve a determination of the taxable aspect of the rights conferred upon the defendant by the agreement in question, nor does the characterization of the defendant in the conclusions of law as 'the agent' of the flood control district operate as a determination that no possessory rights in the real property mentioned and described in the agreement were vested in the defendant.

"The judgment or final order in an action or proceeding is not evidence, conclusive or otherwise, of matters which were not involved in the proceeding and not determined. Matters not in issue in the previous action are not res judicata. (15 Cal.Jur., § 188, p. 134, and cases there cited). And, whether pleaded as a bar or merely as an estoppel, a previous adjudication is conclusive. only as to those matters which were directly in issue and in fact determined. (*St. John* v. *Consolidated Const. Co.*, 182 Cal. 25 [189 P. 276]; *Koehler* v. *Holt Mfg. Co.*, 146 Cal. 335 [80 P. 73].) We conclude that in neither of the prior judgments relied upon was the issue here in question either presented or determined.

"Were it otherwise, however, it is clear that the same result must follow if we apply the third test mentioned in the Bernhard case, namely, identity of parties. Inasmuch as the county of Los Angeles was not a party to either of the prior proceedings, it would appear, upon their face, that they are not binding upon the plaintiff in these actions. Counsel for defendant, however, contends that the county of Los Angeles must nonetheless be considered as a party to the prior proceedings by reason of the fact that the Board of Supervisors of the County of Los Angeles constitute, ex officio, the board of directors of the flood control district which authorized the filing of both prior actions. The fact

remains, however, that the Los Angeles County Flood Control Act expressly declares the district to be a body corporate and politic, vested with the powers and duties therein set forth. It is thus a distinct legal entity, notwithstanding the fact that it comprehends a greater portion of the territory embraced within the county of Los Angeles, and is governed by a board which comprises the same individuals which constitute the Board of Supervisors of Los Angeles County. The latter is a mere fortuitous circumstance. If the Flood Control Act provided for a governing body composed of persons other than the members of the board of supervisors, no one would have the hardihood to suggest that it did not constitute a separate and distinct entity from the county of Los Angeles, and it does not cease to be such merely because the Legislature saw fit to provide that the governing board thereof should consist of the same persons who constitute the Board of Supervisors of Los Angeles County.

"In *People* v. *Richards,* 86 Cal.App. 86 [260 P. 582], it was held that the board and officers of the Los Angeles County Flood Control District 'are state boards and officers' within the meaning of section 72 of the Penal Code, denouncing as a crime the presentation, with intent to defraud, of a claim 'to any state board or officer, or to any county, town, city, district, ward or village board or officer.' ▮ Thus, the Board of Supervisors of the Los Angeles County Flood Control District, when acting as such, are not county officers, but state officers, and any action taken by such board is not action by the Board of Supervisors of the County of Los Angeles, as such, or of the county of Los Angeles.

"Counsel for defendant advances the further claim that even though it be held that the county was not a party to the previous proceedings, the judgments rendered therein are nonetheless binding upon it, upon the principle announced in *People* v. *Holliday,* 93 Cal. 241 [29 P. 54, 27 Am.St.Rep. 186], and other decisions of similar import. The contention, however, is untenable, and the principle adverted to is inapplicable here. This is readily made apparent by a brief consideration of the Holliday case.

"That was an action instituted by the attorney general on behalf of the State of California upon the relation of one Bryant, in which it was alleged that the land therein described, located in the city of San Francisco, was lawfully dedicated to public use as a public square, and that defend-

ants had erected buildings and fences thereon, obstructing its use by the public as such square. In defense of the action the defendant pleaded that in a prior proceeding, wherein he was plaintiff and the city and county of San Francisco was defendant, a decree had been rendered adjudging that the city of San Francisco had no right, title or interest in the land in question, and that this constituted a bar to the maintenance of the present proceeding. The Supreme Court sustained the plea, but the reasons therefor are clearly set forth in the opinion, as follows:

" 'We entertain no doubt that the city and county of San Francisco has the authority to maintain an action for the purpose of preserving the rights of the general public to the use of squares, or land claimed as such, within its limits, and that in such action it is authorized to put in issue the alleged rights of the people to such easement, and that the state itself is bound by the result of such litigation, if the same is not collusive. And we see no reason why these same rights might not also be tried and determined in an appropriate action in which the municipality might be a defendant— as, for instance, ejectment, where it had ousted the claimant from the possession; or by injunction, where it threatened to remove his buildings or trees or a portion of the soil from the land claimed by it as a public square—and the public would be bound by the final judgment therein if the action was conducted in good faith on the part of the city. The rule that the citizen shall not be twice vexed for the same cause of action is as binding upon the state as upon other litigants; and the legislature, in conferring upon the city power to maintain and defend in the courts the rights of the state to streets and squares within its limits, must be presumed to have done so with reference to this well known maxim, and to have intended that the state should be bound by the result of such litigation. And that an action by the adverse claimant against the city, to quiet his title, where the city claims to hold the legal title in trust for the use of the people, as a public square, is an appropriate action to determine such claim, is the effect of the decisions of this court in San Francisco v. Holliday, 76 Cal. 18 [17 P. 942], and San Francisco v. Itsell, 80 Cal. 57 [22 P. 74].

" 'In San Francisco v. Holliday, 76 Cal. 18 [17 P. 942], the action was ejectment by the city and county of San Francisco, for the purpose of recovering the land in controversy in this action, the plaintiff claiming that it held

*the legal title to the land in trust for the people of the state,* and that the same had been dedicated to the use of the public, and that the defendants were intruders thereon. The action was therefore substantially one for the use and benefit of the people of the state, and as the plaintiff therein was authorized by law to bring the action for the purpose of preserving the alleged rights of the people, it could only be defeated by showing that the people of the state were not entitled to maintain such action; and the court, in holding that the right of the city and county of San Francisco to recover possession of the land in controversy for the use of the general public was barred by the judgment in *Holliday* v. *City and County of San Francisco,* which is pleaded in bar of this action, in effect decided that the rights of the people of the state were also barred by that judgment.' (Emphasis supplied.)

"The reading of the foregoing quotation from the opinion makes evident the basis of and limitations upon the doctrine therein announced and that it is wholly without application here. Here there can be no pretext that the Flood Control District was authorized either by the state or the county of Los Angeles to maintain a proceeding having for its purpose the securing of an adjudication as to whether the interests passing to the defendant under the contract in question were such as to be taxable under the Constitution and statutes of this state, and hence even though the District had undertaken to litigate this question with the defendant, any decision thereon would not be binding upon the plaintiff herein.

"In this connection, one final question requires consideration. Counsel for defendant contends, in effect, that, if it be conceded that neither of the prior judgments constitutes a bar to the maintenance of this action *in toto,* they nonetheless operate to estop the plaintiff county from enforcing collection of so much of the tax herein sought to be recovered as represents the portion thereof levied for flood control purposes. The contention, too, is wholly without merit, not only because, as we have seen, no issue as to the right of the county to tax the interests acquired by the defendant under the terms of the agreement in question was presented in the prior proceedings, but for the additional reason that in neither proceeding did the district and the defendant occupy the position of adversaries therein.    'It is also a general principle in the field of *res judicata* that parties to a judg-

ment are not bound by it in a subsequent proceeding or controversy between them, unless they were adverse parties in the original action.' (*Standard Oil Co.* v. *J. P. Mills Organization*, 3 Cal.2d 128, 139 [43 P.2d 797].)

"For all of the foregoing reasons, the Court concludes that the plaintiff is not bound by the judgments in question, and that the same neither operate as a bar to nor estop the plaintiff from maintaining the actions.

*"The Nature and Legal Effect of the Agreement in Question*

"Finally we come to the vital question here presented for determination, namely, the nature and legal effect of the agreement executed between the Los Angeles County Flood Control District and the defendant.

"The agreement in question is a lengthy one and a detailed analysis of each of its many provisions would unduly extend this memorandum. However, it may fairly be said that, although there are variations as will hereafter appear, it contains substantially all of the provisions usually found in the form of oil and gas lease customarily employed in this area. Thus it vests in the defendant (in the agreement and hereinafter referred to as contractor) *the exclusive right, for a term of twenty years and so long thereafter as oil, gas or other hydrocarbon substances is or are produced therefrom, to drill for, produce, extract and remove oil and gas and other hydrocarbon substances in and from, and store the same upon the lands in question;* contractor is granted the *exclusive right* to enter upon said lands at all times and to construct, use, maintain, erect, repair and replace thereon and therein all pipe lines, telephone, power and telegraph lines, tanks, machinery, building and other structures which contractor may require in carrying on its operations, together with rights of way for passage over and upon and ingress to and egress from the said lands for all of said purposes. Contractor agrees to drill a minimum of eight wells, the first to be spudded within 90 days from the effective date of the agreement 'at such location as may be selected by contractor' and thereafter to be drilled diligently to completion or until abandonment; contractor shall keep one string of tools in continuous operation at locations to be selected by it, allowing 30 days between the completion or abandonment of each well and the commencement of operations preparatory to drilling the next well, until the minimum number of wells is reached; 'contractor agreeing to drill such

224

additional wells as it shall seem most likely to effect an adequate and proper drainage of the lands.' The cost of drilling, development and operation shall be paid by the contractor, the district not being obligated therefor save and except that the cost of such drillings and operation, within the limitations prescribed by the agreement, shall be reimbursed to the contractor from and only from the proceeds of the products produced from the land. Contractor is granted the *exclusive right* to and agrees to purchase all of the oil, gas, casinghead gasoline and other hydrocarbon substances produced and saved from said lands, less such amounts as may be necessary for fuel purposes; title to all such products remaining in the district until contractor shall pay the agreed market value therefor, which is defined to mean the highest market price, including any premium or bonus, obtainable from responsible purchases for the products on the date of purchase. Contractor, at its option, may cease from any further drilling upon the lands, provided, however, that if at the time of such cessation all of the wells required to be drilled shall not have been drilled, or in the event contractor does not commence and complete the first well required by the agreement, all of contractor's rights under the agreement shall be forfeited as to any part of said lands not so drilled, *but as to each then producing or drilling well, and any plant or plants of contractor, so much of said lands surrounding same as may necessarily be required by contractor in maintaining and carrying on his operations on the retained well or wells, and at the plant or plants and area or areas shall remain in contractor, together with all rights of way for pipeline, pole lines and equipment upon all of the lands described in the agreement,* as well as the right of ingress to and egress from such retained wells, plants and areas as may be necessary in connection with contractor's operations thereon; contractor also reserving and being granted the right to operate, maintain, perforate, redrill, deepen and/or perform all other operations necessary or expedient to operate or maintain any well or wells located on the retained areas. Contractor is further obligated to drill offset wells to the extent in the agreement provided. While the district reserves the right to drill for, produce and extract hydrocarbon substances from those portions of the lands as to which the agreement shall have been terminated, the district engages that in so doing it will interfere as little as possible with contractor's operations in or upon those

portions of said lands as to which its rights have not been terminated, and any wells drilled by the district shall be drilled with care and caution as to properly protect any zone or zones from which contractor at that time may be producing, and district shall drill no well closer than 250 feet to any drilling or producing well retained by contractor. Contractor is granted the right to erect and maintain a plant or plants for the extraction of natural gasoline from wet gas produced and saved from said lands as well as wet gas belonging to other parties, with a right to commingle such wet gas with that produced and saved from the district's lands. District reserves the right to occupy the lands in question and to use the same for any proper purpose other than the production of oil, gas or hydrocarbon substances.

''Upon expiration of the term of the agreement or a sooner termination thereof, pursuant to its provisions, 'contractor shall quietly and peacefully surrender to district all the rights and privileges created thereby, and all portions of said land occupied by contractor hereunder . . . and on demand of district contractor shall execute and deliver to district good and sufficient instruments of release necessary or convenient to surrender to district any and all rights, privileges and interest which contractor may have under or by virtue of this agreement, at the time of the expiration or termination thereof, and to that end contractor shall execute and deliver to district any and all necessary written instruments reasonably required by any reputable title company for the purpose of eliminating of record such rights, privileges and interest.' Upon breach by contract of any of the terms or conditions of the agreement and its failure to remedy the same within thirty days after written notice from district so to do, then at the option of the district, the agreement and all rights thereunder shall immediately cease and terminate 'as to such well or wells so in default', but the termination of the agreement as to any well or wells shall not be deemed to and shall have no effect upon, and shall effect no reduction in the computation of costs and expenses of contractor, as in this agreement otherwise defined and provided.

''In addition to the drilling and operating obligations imposed upon the contractor, the latter agrees to pay to the district, monthly, a sum computed by subtracting from the

market price of the products produced and saved from the land the applicable expenditures chargeable thereto as defined in the agreement, and applying to the result so obtained percentages, varying from 30 to 65 per cent, depending upon the daily production per well and the gravity of the oil produced. Finally, the agreement provides that it shall inure to the benefit of and be binding upon the successors and assigns of the parties.

"Does this instrument constitute a 'leasehold estate for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth' or grant to defendant 'other rights relating to such substances which constitute incorporeal hereditaments or profits à prendre' as these words are used in section 107, Revenue and Taxation Code?

"The nature and legal characteristics of an oil and gas lease were considered at considerable length by our Supreme Court in *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871].

". . . it would appear fairly obvious that the agreement which has been summarized above, if it does not constitute an oil and gas lease, at least vests in the defendant an incorporeal hereditament or profit à prendre which is taxable under section 107, Revenue and Taxation Code. While denominated by the parties as a 'drilling and operating agreement' rather than as a lease, this is of no particular significance, for it is elementary that the designation which the parties to an agreement see fit to affix to it, is not controlling as to its legal effect. (*Hammond Lumber Co.* v. *County of Los Angeles*, 104 Cal.App. 235, 240 [285 P. 896].) Disregarding mere form, certain it is that it vests in the defendant the exclusive right, for a term of years, 'to drill for and produce oil and other substances' from beneath the surface of the land therein described. In this aspect at least it differs in no respect from the usual oil and gas lease and the court concludes that it is substantially the equivalent thereof.

"In support of his contention that the agreement does not constitute an oil and gas lease or vest in the defendant an incorporeal hereditament or profit à prendre, counsel for the defendant points to the fact (1) that while the defendant must, in the first instance, bear the cost of drilling, development and operation, it is to be reimbursed

therefor, in whole or in part, from the proceeds of the hydro-carbon substances produced by it; (2) that the title to the products produced remain in the district until paid for by the defendant, and (3) that (so it is said) the rights of the defendant thereunder are not assignable by it.

''While perhaps in some or all of these particulars the instrument differs from the customary form of oil and gas lease in common use in this area, none of the alleged points of difference operate to destroy its character as an oil and gas lease, or as an incorporeal hereditament. The fact that the defendant is entitled to reimbursement for some or all of the cost of his operations upon the premises out of the proceeds derived from the products produced therefrom, is of no particular significance, for this is a mere matter of contract or agreement between the parties, which does not affect the legal nature of the rights vested in the defendant. There is no apparent reason why the lessee, when executing an oil and gas lease, may not exact as a condition that he be reimbursed, in whole or in part, for all drilling and operating costs, before any royalty shall become payable to the lessor. While it may be true that the usual provision is that the lessor's royalty shall be computed upon the gross production rather than upon the net, the fact that the latter method is selected by the parties does not alter the nature and legal effect of the instrument as a lease.

''Nor is it of any consequence that here the agreement undertakes to provide that title to the products produced by the defendant shall remain in the district until paid for by it. When considered in the light of the provision that the defendant alone may purchase such products and it is obligated so to do, this provision, upon which counsel for the defendant so much relies, would seem to be nothing more than a method or device designed to secure payment to the district of the royalty or rental herein reserved to it. If, instead of the provision in question, the agreement had provided that title to the products produced should vest in the defendant but the district should have a lien thereon to secure the payment of the royalty therein reserved to it, no one, we believe, would have the hardihood to contend that, by reason of such a provision, the instrument would cease to be an oil and gas lease or that the rights of the defendant thereunder would be, in legal effect, different from what they would have been if the instrument provided that title

to the products should vest in it immediately when produced and severed from the land.

"Finally, if it be assumed, as contended by counsel, that defendant's rights under the agreement are not assignable, this would not operate to destroy its essential character as an oil and gas lease. Such a provision is not an unusual one in leasing agreements, and the court's attention has not been directed to any authority supporting the proposition that the inclusion of such a clause operates to destroy an instrument's character as a lease. Indeed, the very contrary seems to be well established. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 620 [184 P.2d 879].) Contrary to the assumption of counsel, however, the interest of the defendant under the agreement would seem to be assignable in the absence of any provision restricting the right of assignment and the inclusion of the provision that the agreement 'shall inure to the benefit of and be binding upon the successors and assigns of the parties.'

"Nor are the views above expressed in any wise contrary to those to be found in the authorities cited by counsel for the defendant, as will readily appear.

"*Jameson Petroleum Co.* v. *State,* 11 Cal.App.2d 677, [54 P.2d 776], merely holds that an oil and gas lease is real property. In *Roehm* v. *Orange County,* 32 Cal.2d 280 [196 P.2d 550], the question presented was the taxability by a county of a liquor license issued by the State Board of Equalization, and it was held that such a license was not taxable because not listed as an intangible in either the Constitution or the statutes. *Stone* v. *City of Los Angeles,* 114 Cal.App. 192 [299 P. 838], involved the right of the city of Los Angeles to lease certain tidelands and overflow lands for the purpose of drilling for oil and gas thereon, and the holding there was merely to the effect that an oil and gas lease, by its very nature, differs from an ordinary lease and hence was not comprehended by the language of a statute which authorized the city to lease certain tidelands granted to it by the Legislature. *Richfield Oil Co.* v. *Hercules Gasoline Co.,* 112 Cal.App. 431 [297 P. 73], far from supporting defendant's position, is confirmatory of the views previously expressed herein. In speaking of the nature of a profit *à prendre,* the court at page 434 says: 'A "profit *à prendre*" is considered an interest or an estate in the land itself and this is the principal feature which distinguishes it from a pure easement, which is a right or interest without profit. *It is the right to take something out of the soil of another,*

as a right of common, and also some minor rights as a right to fish, hunt, and hawk, or to mine metals, dig for oil; take oil from the land . . . Thus the common oil and gas lease under which the lessee is entitled to enter upon the land of the lessor and develop and remove oil or gas is a ''profit *à prendre.*' ' (Emphasis ours.)

"*In Graciosa Oil Co.* v. *County of Santa Barbara,* 155 Cal. 140 [99 P. 483, 20 L.R.A.N.S. 211], it was held that the estate of a lessee in lands overlying oil bearing strata who has the right under his lease to bore for, extract and convert to his own use oil therefrom, upon paying a royalty to the lessor, without any right to the ordinary usufruct of the soil, may be separately assessed for purposes of taxation to the lessee. It is difficult to see wherein this case affords any comfort to the defendant.

"Counsel places principal reliance upon *In re Okahara,* 191 Cal. 353 [216 P. 614], which was a proceeding in habeas corpus seeking to test the sufficiency of a criminal complaint charging violation of the Alien Land Law, the gravamen of the offense being that the petitioner, in furtherance of an unlawful conspiracy, executed an agreement and contract with one Vicencio, whereby the latter transferred to petitioner for a term of five years *an interest* in a certain parcel of agricultural land containing 20 acres. Vicencio, who was a tenant of the real property in question, executed an agreement with the petitioner whereby the latter agreed to clear the land and make it ready for plowing and planting within a period of two years; the petitioner agreeing to plant the whole of said property to orchard within that period with trees to be furnished by Vicencio. In addition, the petitioner was to plant other crops and agreed to gather, pick and pack all of the fruit and vegetables grown by him; he further agreeing to furnish all labor, machinery, tools and equipment. The agreement further provided that the products were to be sold by Vicencio upon such terms and conditions as he deemed best and the petitioner was to receive as his compensation, in addition to an allowance of $5,000 for clearing the land, 50 per cent of the net proceeds derived from the sale of the products. The agreement expressly provided that the petitioner was to be deemed an independent contractor and was to have 'no interest, right, or claim in or to any part of the said corpus but his sole right shall be to the compensation paid by the employer (Vicencio) as herein pro-

vided,' and further that 'the employer shall have no control over the said contractor and his employees and equipment.' In addition, it was provided that if at any time the employer was dissatisfied with the work done by the contractor, he might immediately terminate the contract on payment to the contractor of compensation as provided in the contract. While the Supreme Court held that the agreement did not constitute a lease and was nothing more than a 'cropping contract', it is at once apparent that the agreement there bears no resemblance to that involved in the instant case. As previously pointed out here, the defendant is vested with the exclusive right to go upon the lands in question and extract therefrom oil and other hydrocarbon substances which are a very part of the land itself, with the exclusive right to acquire the ownership of all of such products, rights which have universally been recognized as an interest in the land itself.

''The last case to which counsel refers is that of *Dabney* v. *Edwards,* 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822], wherein it was held that an ordinary gas lease, *for a definite term of years,* did not constitute real property and that a contract of employment with a real estate broker to sell such a lease was not within the statute of frauds. The decision, however, does not purport to declare that such a lease is not an interest in real property which may be separately assessed and taxed to the lessee. Moreover, the case directly stands for the proposition than an oil and gas lease which, as is the case of the contract here involved, is to endure for a period of years and *'thereafter as long as oil and gas are found, discovered, obtained, or produced,'* constitutes a freehold estate in the nature of a qualified or determinable fee and must be deemed to be real property. This last determination would seem to be completely destructive of the claim advanced by the defendant herein.

''In conclusion it may be said that the court is not oblivious to the fact that, for reasons not too difficult to discern, the parties to the agreement in question sought to give it the appearance of something other and different from an oil and gas lease, but when regard is had to substance rather than form, the true nature and legal effect of the instrument is made unmistakably plain. Despite the efforts of the parties, and whatever the reasons underlying the same may have been, however, the court is satisfied that the interests vested in the

defendant thereunder are clearly comprehended by section 107 of the Revenue and Taxation Code and are properly taxable thereunder."

The judgments are and each is affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied October 16, 1952, and appellants' petition for a hearing by the Supreme Court was denied November 20, 1952.