BILL LOCKYER Attorney General DANIEL G. STONE Deputy Attorney General
THE HONORABLE DENNIS MARSHALL, COUNTY COUNSEL, COUNTY OF FRESNO, has requested an opinion on the following question:
Would a change in the governance of an existing fire protection district, to have the county board of supervisors sit as the district's board of directors, affect the amount of property tax revenues that must be shifted from the district to the Educational Revenue Augmentation Fund?
 CONCLUSION
A change in the governance of an existing fire protection district, to have the county board of supervisors sit as the district's board of directors, would not affect the amount of property tax revenues that must be shifted from the district to the Educational Revenue Augmentation Fund.
 ANALYSIS
We are informed that a county has within its boundaries several independent fire protection districts created under the Fire Protection District Law of 1987 (Health Saf. Code, §§ 13800-13970; "District Law").[1] We are asked whether the amount of property taxes that must be shifted from a district to the Educational Revenue Augmentation Fund (Rev. Tax. Code, § 97.2; "ERAF") would be affected by having the county board of supervisors sit in place of its board of directors. We conclude that such a change in a district's governing board would not affect calculations of the amount of property tax revenues shifted from the district to the ERAF.
Under the District Law, a fire protection district is governed by a board of directors (§ 13840), which may be chosen either by election or by appointment (§§ 13835, 13848). In some circumstances, a city council or a county board of supervisors may appoint itself to act as the district board. (See §§ 13835-13839, 13844.) Section 13835 provides:
 "In the case of a district which contains only unincorporated territory in a single county, the district board may be elected or may be appointed by the county board of supervisors which may appoint itself as the district board."
A district board is charged with the duty to adopt an annual budget and establish an appropriations limit for the district (§§ 13890-13895), and may borrow money, accept revenue, and make appropriations as needed (§§ 13897-13900). It is also authorized to raise revenues through fees and special tax levies (§§ 13910-13919), and to pass resolutions calling for elections on proposals to incur debt through issuance of general obligation bonds (§§ 13925-13938). In 57 Ops.Cal.Atty.Gen. 1, 2 (2004), we described the functions of an independent fire protection district as follows:
 "An independent fire protection district is a special district authorized by statute to provide fire protection services in a defined area. [Citation.] Such districts are not subdivisions of the city or county in which they are located, but are instead separate public agencies organized, existing, and exercising essential government functions pursuant to state law. [Citations.]"
A county board of supervisors exercises the general legislative authority of the county. (See Cal. Const., art XI, § 7; Gov. Code, §§ 23005, 25000-26400; Byers v. Board of Supervisors (1968) 262 Cal.App.2d 148, 157; 86 Ops.Cal.Atty.Gen. 205, 207 (2003); 77 Ops.Cal.Atty.Gen. 82, 83-84 (1994).) With respect to special districts located within a county, the responsibilities of the board of supervisors include those set forth in Government Code section 25303, which provides in part:
 "The board of supervisors shall supervise the official conduct of all county officers, and officers of all districts and other subdivisions of the county, and particularly insofar as the functions and duties of such county officers and officers of all districts and subdivisions of the county relate to the assessing, collecting, safekeeping, management, or disbursement of public funds. It shall see that they faithfully perform their duties, direct prosecutions for delinquencies, and when necessary, require them to renew their official bond, make reports and present their books and accounts for inspection."
In discharging its fiscal responsibilities, a board of supervisors has specific statutory authority to appropriate county funds for certain purposes, including fire protection. (Gov. Code, § 25642.)
Under section 97.2 of the Revenue and Taxation Code, certain property tax revenues that otherwise would be allocated to local governmental entities-including counties, cities, and special districts-are transferred to the ERAF for allocation to school districts, community college districts, and county offices of education. This "ERAF property tax shift" was initiated in 1992, as explained by the court in County of Sonoma v. Commission on State Mandates (2000) 84 Cal.App.4th 1264,1275-1276:
 "In 1992, the Legislature enacted the bill that was subsequently codified as Revenue and Taxation Code section 97.2. That statute reduced the post-Proposition 13 allocation of property taxes to local governments and allocated amounts equal to those reductions to county ERAFs for distribution to the county schools. [Citations.]
 "By 1993, the recessionary economy and the growing revenue requirements of schools jeopardized the state's ability to finance even essential state functions. Given the bleak economic circumstances, the Governor determined that education, along with public safety, had to receive priority over state funding of other local services. The result was that the 1993-1994 budget again reduced the amount of the post-Proposition 13 bailout to local government and reallocated local property tax revenues to ERAFs. [Citation.]
 "The ERAF reallocation design can be summarized as requiring reduction of property tax revenues previously allocated to counties by use of a specified formula, deposit of the reduced amounts into ERAFs, and distribution of the ERAF funds to schools. . . .
 "Concurrently with the ERAF legislation, and thereafter, the state cushioned the loss of revenue to local governments through a variety of mitigation measures, including an additional sales tax, that was established in the Constitution by the voters in 1993, trial court funding reform, supplemental funding for special police protection districts, grants of authority to counties to reduce general assistance levels, loans for property tax administration and a one-time mitigation of $292 million. . . ." (Fns. omitted.)
This shift in property tax revenues by the Legislature for purposes of funding local schools has been examined in various contexts. (See, e.g., City of El Monte v. Commission on State Mandates (2000) 83 Cal.App.4th 266,272; County of Los Angeles v. Sasaki (1994)23 Cal.App.4th 1442, 1452-1453; San Miguel Consolidated Fire Protection Dist. v. Davis (1994)25 Cal.App.4th 134, 141-142.)
The focus of our inquiry is upon Revenue and Taxation Code section 97.2, subdivision (c), which shifts property tax revenues from a special district to the ERAF subject to a ceiling, calculated as a function of the special district's total annual revenues:
 "(1) Subject to paragraph (2), the amount of property tax revenue . . . deemed allocated in the prior fiscal year to a special district . . . shall be reduced by 35 percent. . . .
 "(2) No reduction pursuant to paragraph (1) for any special district . . ., shall exceed an amount equal to 10 percent of that district's total annual revenues, from whatever source, as shown in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Special Districts (not including any annual revenues from fiscal years following the 1989-90 fiscal year) . . . . With respect to a special district that did not exist in the 1989-90 fiscal year, the auditor may use information from the first full fiscal year, as appropriate, to determine the total annual revenues for that special district.
 "(3) The auditor in each county shall, on or before January 15, 1993, and on or before January 30 of each year thereafter, submit information to the Controller concerning the amount of the property tax revenue reduction to each special district within that county as a result of paragraphs (1) and (2). . . .
 "(A) The Director of Finance shall determine whether the total of the amounts of the property tax revenue reductions to special districts, as certified by the Controller, is equal to the amount that would be required to be allocated to school districts and community college districts as a result of a three hundred seventy-five million dollar ($375,000,000) shift of property tax revenues from special districts for the 1992-93 fiscal year. If, for any year, the total of the amount of the property tax revenue reductions to special districts is less than the amount as described in the preceding sentence, the amount of property tax revenue . . ., shall, subject to subparagraph (B), be reduced by an amount up to 5 percent of the amount subject to reduction for that district pursuant to paragraphs (1) and (2).
 "(B) No reduction pursuant to subparagraph (A), in conjunction with a reduction pursuant to paragraphs (1) and (2), for any special district . . ., shall exceed an amount equal to 10 percent of that district's total annual revenues, from whatever source, as shown in the most recent State Controller's Report on Financial Transactions Concerning Special Districts . . . .
 "(C) In no event shall the amount of the property tax revenue loss to a special district derived pursuant to subparagraphs (A) and (B) exceed 40 percent of that district's property tax revenues or 10 percent of that district's total revenues, from whatever source.
 "(4) For the purpose of determining the total annual revenues of a special district that provides fire protection or fire suppression services, all of the following shall be excluded from the determination of total annual revenues:
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(B) The total amount of all funds, regardless of the source, that are appropriated to a district, including a fire department, by a board of supervisors pursuant to Section 25642 of the Government Code or Chapter 7 (commencing with Section 13890) of Part 2.7 of Division 12 of the Health and Safety Code for fire protection. . . .
" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 (Italics added.) Accordingly, under this statutory cap, any reduction in a district's "total annual revenues" also lowers the maximum amount of property tax revenues that may be shifted from the district to the ERAF.
Would these calculations be affected if a county board of supervisors were to "wear two hats," by appointing itself to serve as the board of directors of a fire protection district? We find that nothing in the calculations would change because the "two hats" may not be worn at the same time by the board of supervisors.
A fire district board and a county board of supervisors must be viewed as distinct and separate public bodies, even when the board of supervisors sits as the district board. (83 Ops.Cal.Atty.Gen. 215, 218 (2000).) This principle, which guides our analysis of the question presented, was explained by the court in Pacific States Enterprises, Inc. v. City of Coachella (1993) 13 Cal.App.4th 1414, 1424-1425:
 "Well-established and well-recognized case law holds that the mere fact that the same body of officers acts as the legislative body of two different governmental entities does not mean that the two different governmental entities are, in actuality, one and the same. [Citations.] . . . `Thus, the Board of Supervisors of the Los Angeles County Flood Control District [which is comprised of the same legislative body of persons as the Board of Supervisors of the County of Los Angeles], when acting as such, are not county officers, but state officers, and any action taken by such board is not action by the Board of Supervisors of the County of Los Angeles, as such, or of the county of Los Angeles.' [Citation.]
 ". . . When a `dual capacity legislative body' acts as the governing board of a redevelopment agency, it is the redevelopment agency which is acting by and through that legislative body; and when that same legislative body acts as the governing body of the `community' (i.e., city) over which it exercises local governmental powers, it is the `community' which is acting by and through that legislative body. The redevelopment agency and the `community' are not one and the same governmental entity. The redevelopment agency, by state law, exists `in each community' with certain limited powers and functions [citation] — it is not the same entity as the community within which it exists."
In 83 Ops.Cal.Atty.Gen. 215, supra, we applied the foregoing principle and concluded that members of a city council which had appointed itself to be both the city's housing authority and the city's redevelopment agency, and had thereafter conducted a "unified meeting" of all three public entities, could not "receive the remuneration provided by law for members of a redevelopment agency or for commissioners of a housing authority if no business within the jurisdiction of the redevelopment agency or housing authority [was] conducted at the unified meeting." (Id. at pp. 219-220.)
Similarly, here, a county board of supervisors and a fire protection district board of directors would be two distinct and separate public bodies, even when the county board of supervisors was acting as the district's governing board. (See Pacific States Enterprises, Inc. v. City of Coachella, supra, 13 Cal.App.4th at p. 1425.) When a board of supervisors sits as the governing board of a fire protection district, it acts pursuant to the powers, duties, and prerogatives of a district board, with the same limitations and consequences that a district board would experience. Any action the board of supervisors takes as the district board " `is not action by the Board of Supervisors . . ., as such, or of the county . . . .' " (Id. at p. 1424, quoting County of L. A. v. Continental Corp. (1952) 113 Cal.App.2d 207, 220.) Conversely, any action taken pursuant to the authority of the board of supervisors would be attributable to the county, and not the district. (Ibid.)
Consequently, when a board of supervisors acts as a fire protection district's governing board and allocates or appropriates district funds, such allocations and appropriations are treated no differently, for purposes of calculating the district's "total annual revenues" and the amount of property taxes that must be shifted from the district to the ERAF, than if they had been made by a separate board of directors. Moreover, any funds appropriated by a county board of supervisors to a fire protection district pursuant to Government Code section 25642 are treated in the same manner with respect to their exclusion from "total annual revenues" in determining the amount of property tax revenues shifted from the district to the ERAF, whether the district is governed by a separate board of directors or by the board of supervisors.[2]
We conclude that a change in the governance of an existing fire protection district, to have the county board of supervisors sit as the district's board of directors, would not affect the calculations of the property tax revenues that must be shifted from the district to the ERAF.
[1] All references hereafter to the Health and Safety Code are by section number only.
[2] Likewise, we note that a reorganized or newly formed fire protection district would have its "total annual revenues" calculated in the same manner whether the district had an "independent" board of directors or the board of supervisors as its governing board.